# **Exhibit 1**

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

| | |
|---|---|
| OCEAN BANK,<br><br>Plaintiff,<br>vs.<br><br>BENJI AUTO SALES CORP., BENJI URRA, ANGELA ELENA URRA, and QUICK SHIFT CAPITAL LLC,<br><br>Defendants. | Circuit Civil Division<br>Case No. |

**VERIFIED COMPLAINT**

Plaintiff, Ocean Bank ("Ocean Bank"), sues Defendants, Benji Auto Sales Corp. ("Benji Auto"), Benji Urra ("Mr. Urra"), Angela Elena Urra ("Ms. Urra"), and Quick Shift Capital LLC ("Quick Shift"), and alleges as follows.

**Jurisdiction, Venue, and Parties**

1. This is an action on a loan secured in part by personal property located in Broward County, Florida, more particularly described in Exhibit A attached hereto and incorporated herein by reference, and to enforce the underlying promissory note and guaranty for money damages and related equitable relief in excess of $50,000.00, exclusive of interest, attorneys' fees, and costs.

2. This Court has subject-matter jurisdiction under § 26.012(2), Florida Statutes.

3. Venue lies in this Court under § 47.011, Florida Statutes, because the causes of action accrued in Broward County, Florida, and the personal

property at issue is located in Broward County, Florida.

4. Ocean Bank is a Florida banking corporation. Its principal address is 780 NW 42nd Avenue, Miami, FL 33126, in Miami-Dade County, Florida.

5. Benji Auto is a Florida corporation, with a principal address of 3805 S. State Road 7, West Park, FL 33023, in Broward County, Florida.

6. Mr. Urra is an individual over the age of 18 who resides at 14850 Millstone Ranches Dr., Davie, FL 33331, in Broward County, Florida.

7. Ms. Urra is an individual over the age of 18 who resides at 14850 Millstone Ranches Dr., Davie, FL 33331, in Broward County, Florida.

8. Quick Shift is a Florida limited liability company. Its principal address is 2200 Butts Road, Suite 240, Boca Raton, FL 33431.

**General Allegations**

9. On or about April 17, 2025, Ocean Bank made a line of credit loan to Benji Auto in the amount of $5,000,000.00 (the "Floor Plan Loan"), secured by Benji Auto's dealer vehicle inventory and all proceeds from the sale of the vehicles. The personal property collateral for the Floor Plan Loan is more particularly described in Exhibit A attached hereto and incorporated herein by reference (the "Collateral").

10. The Floor Plan Loan is evidenced by a Loan and Security Agreement entered into by Ocean Bank and Benji Auto on or about April 17, 2025 (the "Credit Agreement"). A copy of the Credit Agreement is attached as Exhibit B.

11. Ocean Bank perfected its lien on the Collateral by filing a UCC-1 Financing Statement with the Florida Secured Transactions Registry under File

No. 202500995044 on April 21, 2025, (the "Financing Statement"). A copy of the Financing Statement is attached as Exhibit C.

12. Benji Auto is obligated to pay the Floor Plan Loan pursuant to a Demand Line of Credit Promissory Note in the amount of $5,000,000.00 that it executed and delivered to Ocean Bank on or about April 17, 2025 (the "Note"). A copy of the Note is attached as Exhibit D.

13. Mr. Urra and Ms. Urra guaranteed payment of the Floor Plan Loan pursuant to a Guaranty Agreement that they executed and delivered to Ocean Bank on or about April 17, 2025 (the "Guaranty"). A copy of the Guaranty is attached as Exhibit E.

14. Ocean Bank holds a Power of Attorney executed and delivered by Benji Auto on or about April 17, 2025, which names and appoints Ocean Bank as lawful attorney-in-fact to act for Benji Auto, in applying for an original or duplicate certificate of title, to register, transfer title, or record a lien with respect to any motor vehicle owned by Benji Auto, and to print Benji Auto's name and sign on its behalf, among other things (the "Power of Attorney"). A copy of the Power of Attorney is attached as Exhibit F.

15. Ocean Bank owns and holds the Credit Agreement, the Financing Statement, the Note, the Guaranty, the Power of Attorney, and all the other documents executed and delivered in connection with the Floor Plan Loan (collectively, the "Loan Documents").

16. Benji Auto now owns and holds possession of the Collateral.

17. On or about September 11, 2025, Ocean Bank issued a notice to

Benji Auto, Mr. Urra, and Ms. Urra notifying them of certain breaches of the Loan Documents that would constitute an "Event of Default" (the "Default Notice"). A copy of the Default Notice is attached as Exhibit G.

18. On or about September 15, 2025, Ocean Bank issued a notice to Benji Auto, Mr. Urra, and Ms. Urra accelerating the Floor Plan Loan and demanding payment in full (the "Acceleration Notice"). A copy of the Acceleration Notice is attached as Exhibit H.

19. Ocean Bank demands payment by Benji Auto, Mr. Urra, and Ms. Urra jointly and severally of the following amounts due on the Floor Plan Loan:

| | |
|---|---|
| Unpaid principal balance | $4,323,491.75 |
| Accrued default interest | $39,682.81 |
| Total amount due through September 22, 2025 plus all interest that continues to accrue, attorney's fees, costs, and all other permitted charges and expenses, including, but not limited to, security costs, audit costs, and valuation costs. | $4,363,174.56 |

20. Ocean Bank has retained the law firm of Weissman & Dervishi, P.A. to prosecute this action on the Floor Plan Loan, and is obligated to pay its attorneys' fees and costs. Ocean Bank is entitled to recover its reasonable attorneys' fees and costs incurred in this action pursuant to Section 13.3 of the Note, Section 21 of the Credit Agreement, and Section 9.4 of the Guaranty.

21. All conditions precedent to this action have occurred, have been performed, or have otherwise been waived.

**Count I**
**Action to Foreclose Security Interest**

Ocean Bank realleges and incorporates into this count the allegations set forth in paragraphs 1-21 above.

22. Benji Auto, Mr. Urra, and Ms. Urra defaulted under the Loan Documents and have not paid the Floor Plan Loan.

23. Pursuant to the Loan Documents, the Floor Plan Loan is secured by, among other things, a first-priority security interest in and lien on the Collateral described in Exhibit A, including motor vehicles. Ocean Bank's lien on the Collateral was perfected by the filing of the Financing Statement.

24. Quick Shift may claim an interest in or lien upon some or all of the Collateral by virtue of a UCC-1 Financing Statement filed with the Florida Secured Transactions Registry under File No. 202402304276 on August 29, 2024, but such interest or lien, if any, is subject, subordinate, junior, and inferior to Ocean Bank's first-priority security interest in the Collateral. Pursuant to an Intercreditor and Subordination Agreement entered into by Ocean Bank and Quick Shift on or about April 17, 2025 (the "Intercreditor Agreement"), Quick Shift subordinated its security interest in the Collateral and acknowledged that Ocean Bank has a senior-priority security interest in the Collateral regardless of the time of attachment or perfection of such security interest, with the exception of certain motor vehicles that Quick Shift specifically financed. A copy of the Intercreditor Agreement is attached as Exhibit I.

25. Ocean Bank's rights and remedies under Section 21 of the Credit Agreement include, among other things: (i) Ocean Bank shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code or any other remedy available under law (including, without limitation,

repossession of any Collateral with or without resort to judicial proceedings and without any requirement to give Benji Auto prior notice of such actions); (ii) upon the request or demand of Ocean Bank, Benji Auto shall, at Benji Auto's expense, immediately assemble the Collateral and make it available to Ocean Bank in order to allow Ocean Bank to take possession at a convenient place acceptable to Ocean Bank; (iii) Benji Auto shall immediately execute and deliver to Ocean Bank any and all instruments, documents, certificates of title, or any similar items which Ocean Bank, in its sole discretion, deems necessary to dispose of the Collateral, and Benji Auto appoints Ocean Bank as its attorney-in-fact to execute, sign, and seal any and all such instruments, documents, certificates of title, or any similar items which Ocean Bank, in its sole discretion, deems necessary to dispose of the Collateral after default; and (iv) Benji Auto shall pay to Ocean Bank on demand any and all costs and expenses, including legal expenses and reasonable attorneys' fees, including costs, expenses, and reasonable attorneys' fees on appeal, incurred or paid by Ocean Bank in protecting and enforcing the Note and the rights of Ocean Bank under the Credit Agreement, including Ocean Bank's right to take possession of the Collateral and to hold, prepare for sale, sell, and dispose of the Collateral, whether or not a lawsuit is instituted.

26. Benji Auto has failed and refused to deliver possession of all the vehicles and other Collateral that secure the Floor Plan Loan, and has moved Collateral without Ocean Bank's consent, in breach of the Credit Agreement. Ocean Bank is entitled under the Loan Documents to immediate possession of

the Collateral. In order to prevent further damage to Ocean Bank, the Court should enter an injunction prohibiting Benji Auto from concealing the vehicles, selling the vehicles, removing the vehicles from the jurisdiction of this Court, or otherwise disposing of the vehicles without paying Ocean Bank, or some other form of injunctive relief to preserve the status quo and protect the Collateral.

27. If the Court does not enter an injunction, Ocean Bank is likely to suffer irreparable harm because it risks being deprived of the Collateral that secures the Floor Plan Loan. Benji Auto is engaging in, or is about to engage in, conduct that may place the Collateral in danger of concealment, waste, loss, removal from the jurisdiction of this Court, or transfer to an innocent purchaser during the pendency of this action. Without the Collateral, Ocean Bank could potentially be rendered an unsecured creditor standing in line with other unsecured creditors that do not have a perfected security interest. Ocean Bank is therefore without an adequate legal remedy. There is a high likelihood that Ocean Bank will succeed on the merits of the claims alleged in this complaint. Public policy supports granting an injunction where the potential harm is high to Ocean Bank and minimal to Benji Auto. The issuance of an injunction will further the public interest by enforcing the clear and unambiguous terms of the Loan Documents and instilling confidence in properly executed secured transactions. The injunctive relief requested is conduct that Benji Auto is already required to be doing under the Loan Documents. Requiring it to do what it has already pledged to do cannot disserve the public interest. It would maintain the status quo and prevent the dissipation of the Collateral.

28. In addition or in the alternative, the Court should appoint a receiver for the Collateral. Benji Auto is insolvent in that it has more liabilities than assets, and it cannot pay its debts as they become due. Benji Auto has committed waste of the Collateral and the proceeds thereof. Benji Auto has moved the Collateral and refused to make it available for Ocean Bank. A receiver is needed to protect and preserve the Collateral, and to maximize its value for Ocean Bank as senior secured creditor. If the Court does not appoint a receiver, Ocean Bank will suffer irreparable injury for which there is no adequate remedy at law. A money judgment against Benji Auto is not an adequate substitute for the Collateral, which Benji Auto pledged as security for the Floor Plan Loan.

WHEREFORE, Ocean Bank demands (1) a final judgment foreclosing its security interest in the Collateral, and the interests of all inferior claims thereto, including the claims of all persons claiming after the filing of the Notice of Lis Pendens in this action; (2) preliminary and permanent injunctive relief; (3) the appointment of a receiver for the Collateral; (4) any and all other available legal or equitable relief or remedies; (5) an award of attorneys' fees and costs; and (6) all such further relief as is just and appropriate.

**Count II**
**Replevin of the Collateral**

Ocean Bank realleges and incorporates into this count the allegations set forth in paragraphs 1-28 above.

29. The Collateral is held at Benji Auto's dealership located at 3805 S. State Road 7, West Park, FL, 33023.

30. Upon information and belief, the approximate value of the Collateral

is equal to or less than the outstanding total amount due on the Floor Plan Loan.

31. Under the Credit Agreement and in the Acceleration Notice, Ocean Bank demanded that Benji Auto assemble the Collateral and make it available to Ocean Bank in order to allow it to take possession at a convenient place acceptable to Ocean Bank. Benji Auto refused to fully comply with the demand.

32. Benji Auto is engaging in, or is about to engage in, conduct that may place the Collateral in danger of concealment, waste, loss, removal from the jurisdiction of this Court, or transfer to an innocent purchaser during the pendency of this action.

33. Benji Auto came into possession of the Collateral by purchasing it from third parties with loan proceeds advanced by Ocean Bank, and Benji Auto detains the Collateral for its business purposes.

34. Benji Auto is wrongfully detaining the Collateral because it agreed in the Credit Agreement that in the event of a default on the Floor Plan Loan it would give possession of the Collateral to Ocean Bank, and despite its agreement, when Benji Auto defaulted on the Floor Plan Loan, it failed to give Ocean Bank possession.

35. The Collateral has not been taken for any tax, assessment, or fine pursuant to law, nor has it been taken under an execution or attachment.

WHEREFORE, Ocean Bank demands a writ of replevin against the Collateral, a final judgment of possession against the Collateral, an award of attorneys' fees and costs, and such further relief as is just and appropriate.

**Count III**
**Action on the Note**

Ocean Bank realleges and incorporates into this count the allegations set forth in paragraphs 1-21 above.

36. Benji Auto defaulted on the Note. There is no cure period.

37. Ocean Bank is entitled to the entry of a final judgment against Benji Auto on the Note in the total amount of $4,363,174.56 as of September 22, 2025, plus all interest that continues to accrue, attorneys' fees, costs, and all other permitted charges and expenses, including but not limited to security costs, audit costs, and valuation costs.

WHEREFORE, Ocean Bank demands entry of a judgment in its favor against Benji Auto on the Note in the total amount of $4,363,174.56 as of September 22, 2025, plus all interest that continues to accrue, attorneys' fees, costs, and all other permitted charges and expenses, including but not limited to security costs, audit costs, and valuation costs, related equitable and pre-judgment relief including writs of attachment and garnishment, and all such further relief as is just and appropriate.

**Count IV**
**Action on the Guaranty**

Ocean Bank realleges and incorporates into this count the allegations set forth in paragraphs 1-21 above.

38. Mr. Urra and Ms. Urra defaulted on the Guaranty. An "Event of Default" under any of the Loan Documents is a default on the Guaranty. There is no cure period.

39. Ocean Bank is entitled to the entry of a final judgment against Mr. Urra and Ms. Urra on the Guaranty in the total amount of $4,363,174.56 as of September 22, 2025, plus all interest that continues to accrue, attorneys' fees, costs, and all other permitted charges and expenses, including but not limited to security costs, audit costs, and valuation costs.

WHEREFORE, Ocean Bank demands entry of a judgment in its favor against Mr. Urra and Ms. Urra on the Guaranty in the total amount of $4,363,174.56 as of September 22, 2025, plus all interest that continues to accrue, attorneys' fees, costs, and all other permitted charges and expenses, including but not limited to security costs, audit costs, and valuation costs, related equitable and pre-judgment relief including writs of attachment and garnishment, and all such further relief as is just and appropriate.

Dated: September 22, 2025.

Respectfully submitted,

WEISSMAN & DERVISHI, P.A.

By: /s/ Peter A. Tappert
Brian S. Dervishi
Peter A. Tappert
Amanda Tresgallos
Florida Bar Nos. 350303, 27100, 1059624
One SE Third Avenue, Suite 1700
Miami, Florida 33131
305-347-4070 (Telephone)
bdervishi@wdpalaw.com
ptappert@wdpalaw.com
atresgallos@wdpalaw.com
service@wdpalaw.com

Attorneys for Ocean Bank

**VERIFICATION**

Under penalties of perjury, I declare that I have read the foregoing Verified Complaint and that the facts stated in it are true and the exhibits attached to it are true and correct copies of the originals they purport to duplicate.

Dated: September 22, 2025.

________________________________
Joseph Moussa
Vice President
Ocean Bank

# Exhibit A

# EXHIBIT A

## Personal Property Collateral

(i) all of Benji Auto's Accounts, Chattel Paper, Documents, General Intangibles, Instruments and Inventory, whether now owned or hereafter acquired and all products and proceeds of all of the foregoing;

(ii) to the extent not encumbered above, all of Benji Auto's right, title and interest in and to the goods or other property represented by or securing the Accounts and Chattel Paper;

(iii) to the extent not encumbered above, all of Benji Auto's new and used motor vehicles, together with all parts, accessories, furnishings and attachments thereto, all parts inventory, and all monies and credits now due or to become due, and all claims against all manufacturers or distributors of vehicles such as factory credits, finance reserves, holdbacks, cash allowances and incentive payments;

(iv) to the extent not encumbered above, all of Benji Auto's now-owned and hereafter acquired equipment, including, without limitation, furniture and fixtures, and all present and future warranty and other claims which Benji Auto's may have against any vendor or lessor of any of the foregoing;

(v) all of Benji Auto's rights as an unpaid vendor or lienor, including stoppage in transit, replevin and reclamation;

(vi) all property of Benji Auto now or hereafter in possession of or under control of Bank, or any correspondent or affiliate of the Bank, in any capacity whatsoever, including, but not limited to, any balance of any trust, deposit, checking reserve or agency account and proceeds thereof;

(vii) all accounts receivable, bank accounts, cash or noncash proceeds resulting from the sale, exchange, collection or disposition of any Collateral, including but not limited to, trade-in vehicles and insurance payable by reason of loss or damage to Collateral; and

(viii) all keys, books, records, ledger cards and other property relating to (i) - (vii) above including computer programs, tapes and related software.

# Exhibit B

# LOAN AND SECURITY AGREEMENT (FLOOR PLAN LOAN)

**THIS LOAN AND SECURITY AGREEMENT** (this "Agreement") is made and entered into and effective as of this 17th day of April, 2025, by and between **OCEAN BANK** (the "Bank"), with its principal place of business located at 780 N.W. 42nd Avenue, Miami, Florida 33126, and **BENJI AUTO SALES CORP**., a Florida corporation (the "Borrower"), with its principal office located at 3805 S. State Road 7, West Park, Florida 33023.

## RECITALS

In consideration of the mutual promises contained herein and to induce Bank to make loans or grant other financial accommodation to Borrower, the parties agree as follows:

1. Definitions. As used herein:

(a) The definitions of terms set forth in the Florida Uniform Commercial Code, Chapters 671 - 680, Florida Statutes, shall be controlling in this Agreement unless the context clearly requires otherwise.

(b) "Account" shall mean an immediate right to payment for inventory sold, rented or leased, and includes a right to payment under a contract whether or not it has been earned by performance.

(c) "Business Days" shall mean any day other than Saturdays, Sundays or days on which banking corporations located in Miami, Florida are authorized by law to remain closed.

(d) "Chattel Paper" shall mean a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods.

(e) "Collateral" shall mean with regard to the Line of Credit described in paragraph 2 hereof:

(i) all of Borrower's Accounts, Chattel Paper, Documents, General Intangibles, Instruments and Inventory, whether now owned or hereafter acquired and all products and proceeds of all of the foregoing;

(ii) to the extent not encumbered above, all of Borrower's right, title and interest in and to the goods or other property represented by or securing the Accounts and Chattel Paper;

(iii) to the extent not encumbered above, all of Borrower's new and used motor vehicles, together with all parts, accessories, furnishings and attachments thereto, all parts inventory, and all monies and credits now due or to become due, and all claims against all manufacturers or distributors of vehicles such as factory credits, finance reserves, holdbacks, cash allowances and incentive payments;

(iv) to the extent not encumbered above, all of Borrower's now-owned and hereafter acquired equipment, including, without limitation, furniture and fixtures, and all present and future warranty and other claims which Borrower may have against any vendor or lessor of any of the foregoing;

(v) all of Borrower's rights as an unpaid vendor or lienor, including stoppage in transit, replevin and reclamation;

(vi) all property of Borrower now or hereafter in possession of or under control of Bank, or any correspondent or affiliate of the Bank, in any capacity whatsoever, including, but not limited to, any balance of any trust, deposit, checking reserve or agency account and proceeds thereof;

(vii) all accounts receivable, bank accounts, cash or noncash proceeds resulting from the sale, exchange, collection or disposition of any Collateral, including but not limited to, trade-in vehicles and insurance payable by reason of loss or damage to Collateral; and

(viii) all keys, books, records, ledger cards and other property relating to (i) - (vii) above including computer programs, tapes and related software.

(f) "Documents" shall mean any presently owned or subsequently acquired bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business of financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers, whether negotiable or non-negotiable.

(g) "Financed Inventory" shall mean all Motor Vehicle Inventory financed in whole or in part by the Bank, held for sale, lease or rent or being processed for sale, lease or rent in Borrower's business located at 3805 S. State Road 7, West Park, Florida 33023, or any other address at which the Borrower shall do business selling Motor Vehicle Inventory (which locations shall be subject to the prior approval of Bank, and subject to a landlord's lien waiver agreement with any such landlord in a form acceptable to Bank), as now or hereafter conducted, together with all increases, parts, fittings, radios, accessories and special tools now or hereafter affixed to any or any part thereof and all replacements of all or any part thereof.

(h) "Floor Plan Note" or "Note" shall mean that certain Promissory Note in the maximum aggregate principal amount of $5,000,000.00 dated of even date herewith, payable on demand, representing the Borrower's indebtedness described in paragraph 2 hereof and otherwise payable pursuant to the provisions of this Agreement, in form and substance satisfactory to the Bank and any and all renewals or modifications thereof and allonges thereto.

(i) "General Intangibles" shall mean any personal property (including things in action) other than goods, Accounts, Chattel Paper, Documents, Instruments and money and including, but not limited to, manufacturing and processing rights, goodwill, patents, patent rights, licenses, franchises, permits, trademarks, trade names, trademark and trade name registrations and applications, trade secrets, customer lists, tax refund claims, incentive

payments, insurance proceeds, service marks, and copyrights, now owned or hereafter acquired, and any proceeds of any of the foregoing.

(j) "Ground Lease" shall mean that certain Ground Lease between Yardley Car Company, a Florida corporation ("Original Tenant"), and 777 North State Road 7, Inc., a Florida corporation, having a commencement date as of January 1, 2022, as assigned by Original Tenant to GT FTL on or about the date hereof.

(k) "Instrument" shall mean a negotiable instrument or a certificated security or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary endorsement or assignment.

(l) "Interest Rate" shall mean the applicable interest rate as more particularly set forth in the Note.

(m) "Inventory" shall mean all of the Borrower's now owned and hereafter acquired inventory, including, but not limited to, Motor Vehicle Inventory held for sale, lease or rent or being processed for sale, lease or rent in Borrower's business, whether located at the above addresses or at any other address at which the Borrower shall do business, as now or hereafter conducted, or held by a third party for sale, together with all increases, parts, fittings, radios, accessories, attachments and special tools now or hereafter affixed to any or any part thereof and all replacements of all or any part thereof.

(n) "Liability" or "Liabilities" shall include the Note and all liabilities or obligations (primary, secondary, direct, contingent, sole, joint or several) due or to become due pursuant to the Note and this Agreement, including costs, expenses, and reasonable attorneys' and paralegals' fees (including reasonable attorneys and paralegals' fees in any bankruptcy or appellate case or proceeding), for which the Borrower may be liable, whether or not a lawsuit is instituted and all other payment and performance duties, obligations and liabilities of the Borrower to the Bank, however and whenever incurred, acquired or evidenced, whether primary or secondary, direct or indirect, absolute or contingent, sole or joint and several, or due or to become due, including without limitation, all such duties liabilities and obligations of the Borrower to the Bank under and pursuant to the Loan Agreement, any Loan Document, and the Note and all renewals, extensions, modifications or amendments of any thereof.

(o) "Line of Credit" shall mean that certain revolving floor plan line of credit provided by the Bank for the benefit of the Borrower in the amount of $5,000,000.00 to be used by the Borrower to purchase Financed Inventory.

(p) "Model Year" shall mean the model year of the vehicle based on a calendar year, i.e. a 2025 Model Year is a CURRENT MODEL until January 1, 2026, at which time it would be considered One Prior Model Year old.

(q) "Note" shall mean the Demand Line of Credit Promissory Note.

(r) "Motor Vehicle Inventory" shall mean used motor vehicles approved by the Bank, and held for sale, lease or rent or being processed for sale, lease or rent in Borrower's business, as now or hereafter conducted, together with increases, parts, fittings, radios, accessories and special tools now or hereafter affixed to any or any part thereof and all replacements of all or any part thereof. Used vehicles cannot be financed or kept on Borrower's floor plan if the vehicle: (a) is older than five (5) prior model years; or (b) was previously advanced against under the Line of Credit (i.e., no re-flooring after payment or curtailment is permitted).

2. Line of Credit. Subject to the terms of this Agreement, Bank shall make available to Borrower a Line of Credit for the purchase by Borrower of Financed Inventory. The actual principal balance due Bank at any given time will be determined not by the face amount of the Floor Plan Note but by the aggregate principal amount actually advanced by Bank to Borrower remaining unpaid, plus interest thereon, less any sums collected by Bank in payment of interest and in reduction of principal of the loan or loans represented by the Floor Plan Note. The Line of Credit shall constitute a "revolving" line of credit, entitling Borrower to borrower, repay, and reborrow under the Line of Credit, provided that the aggregate balance of principal remaining outstanding at any one time for advances hereunder shall never exceed the total of $5,000,000.00. The entire principal amount of the Floor Plan Note and all accrued and unpaid interest and fees thereon shall be due and payable ON DEMAND.

3. Interest Rate. Notwithstanding the rate of interest specified on the Floor Plan Note, the interest payable under the Floor Plan Note shall accrue as follows: with regard to the Floor Plan Note, each advance thereunder, shall initially bear interest from the date of the advance at a rate equal to the Interest Rate for advances; provided, however, that the Interest Rate accruing under the Note shall never exceed the maximum lawful rate, established from time to time, under the laws applicable to loans in Florida. Any interest due on the loans made hereunder or any other Liability shall be calculated on the basis of a year containing 360 days.

4. Advances under Line of Credit. From the date hereof until the termination of this Agreement as provided in paragraph 24 hereof, the Borrower shall be entitled to advances of principal under the Floor Plan Note made in accordance with the terms hereof. The Line of Credit shall constitute a "revolving" line of credit, entitling Borrower to borrow, repay and reborrow under the Line of Credit. Advances pursuant hereto shall be used solely for the purchase of Financed Inventory and shall be disbursed as follows:

(a) Borrower may from time to time request loans for the purchase of Motor Vehicle Inventory in an amount equal to:

The lesser of (x) one hundred percent (100%) of the Borrower's cost of acquiring the motor vehicle (not to exceed the "dealer's invoiced delivered cost" or the paid invoice), as determined by Bank, or (y) one hundred percent (100%) of the NADA average book value of any such motor vehicle;

(b) Each request shall be in writing and shall be accompanied by: (i) an original Motor Vehicle Certificate of Title for the motor vehicle; (ii) a copy of the executed contract of sale of the motor vehicle; (iii) copy of the Ocean Bank check used to pay for the

motor vehicle; and (iv) such other documents as may be requested by Bank. Upon receipt of the foregoing documents in form and substance satisfactory to Bank, Bank shall upon approval of same, pay the amount requested to the seller of the motor vehicle and such payment shall constitute an advance to Borrower hereunder. If the request is related to a vehicle purchased at an auto auction, the request does not need to be accompanied by (i) Title for the motor vehicle, nor (ii) copy of the Ocean Bank check used to pay for the motor vehicle, so long as the Borrower directs the auction to send all titles for purchased inventory to Ocean Bank, ATTN: Floorplan Department, 780 NW 42nd Ave, Miami, FL 33126. Upon receipt of (i) a copy of the executed contract of sale of the motor vehicle via an auto auction and (ii) proof of ACH or wire payment from an Ocean Bank account to the auction, and (iii) such other documents as may be requested by Bank, Bank shall pay the amount requested to the Borrower and such payment shall constitute an advance to Borrower hereunder. Notwithstanding the foregoing, Motor Vehicle Inventory shall become ineligible for advances under the Floor Plan Note after they are one hundred and twenty (120) days or more from the acquisition date.

(c) The Loan and all disbursements of Loan proceeds will be subject to the Bank's standard ABL floor plan controls and procedures, including monthly unscheduled field inspections (or more frequently if the circumstances require) and an inspection fee per inspection, each in the amount of $750.00 (for the Orlando location), and $250 (for the West Park location). The Loan shall be subject to monthly audits for leased vehicles detailing the location of the vehicles by obtaining copies of leasing contracts and other information required by the Bank. Borrower must provide Bank with a written explanation for any discrepancy resulting from an audit within twenty-four (24) hours of being advised of said discrepancy. All motor vehicles will be subject to a pre-funding vehicle field inspection prior to each disbursement of Loan proceeds.

(d) Each annual renewal of the Loan is subject to payment by Borrower of a $12,500 annual fee, which shall be paid on each anniversary of the Loan, which will be paid either by way of an advance to the line of credit for the fee collection or the Borrower will be billed by Lender for the fee assessment, as determined by Lender. Borrower shall also be responsible to pay Bank a $25,000 penalty for any/each covenant violation occurring (in addition to the Bank's annual loan fee) prior to renewal of the Loan.

5. Line of Credit Payments. Notwithstanding any of the terms hereof, upon the sale of any specific item of Financed Inventory, Borrower will immediately within twenty-four (24) hours after Borrower's receipt of sale proceeds from such sale (but in no event later than the time periods set forth in Exhibit "A" attached hereto) pay to Bank the amount advanced by Bank for such item of Financed Inventory less only any sums paid by Borrower to Bank and applied by Bank against the amount advanced for the Financed Inventory. From the date Bank advances sums in conjunction with the purchases of any specific item of Financed Inventory until the sale thereof, Borrower shall pay Bank a principal reduction of the amount so advanced on the specific item of Financed Inventory as provided in Exhibit "A" attached hereto and by reference made a part hereof. Payment of interest accruing under the Floor Plan Note shall be paid monthly, commencing May 17, 2025, and then continuing on the same day of each month thereafter throughout the term of this Agreement, with principal payable ON DEMAND.

6. Security Interest. As security for the payment of all loans and advances now or in

the future made hereunder, including the Floor Plan Note, and for all other Liabilities, Borrower hereby assigns to Bank and grants to Bank a security interest in the Collateral.

7. Inventory. Borrower and Bank agree that Advances on Inventory designated as a demonstrator vehicle shall be limited to three (3) motor vehicles, with advances not to exceed a total maximum combined value of $75,000.00.

8. Other Obligations. So long as any Liability to Bank is outstanding Borrower will not without the prior written consent of Bank, other than subordinated debt owed to the related entities and affiliates of the Borrower and the Santander Loan (as defined in the Floor Plan Note), borrow from anyone except Bank on security of, or pledge or grant any security interest in, any Collateral to anyone except Bank, or permit any lien or encumbrance to attach to any of the foregoing, or any levy to be made thereon, or any financing statement (except Bank's financing statement) to be on file with respect thereto.

9. Lien Holder. Borrower agrees that Bank shall be listed as the first lien holder on all Motor Vehicle Certificates of Title for Financed Inventory held for leasing.

10. Financial Covenants. At all times during the term of this Agreement, the Borrower shall be in compliance with the financial covenants set forth in the Loan Documents.

11. Additional Covenants. Borrower covenants to Bank that it shall:

(a) immediately notify Bank in writing of any change in the location of the places of business where the bulk of Borrower's Financed Inventory is located or any change in the location of the place of business where the records concerning Borrower's Accounts are kept;

(b) collect its Accounts and sell its Financed Inventory only in the ordinary course of business and not sell any Financed Inventory to any principal, owner or employee of Borrower or family member thereof;

(c) keep the Collateral in good repair;

(d) keep accurate and complete records of its Financed Inventory and Accounts and provide the Bank with a copy of the Financed Inventory and payment histories for all financed and leased vehicles on a monthly basis;

(e) pay and discharge when due all taxes, levies and other charges on its Financed Inventory and on account of or in connection with its Liabilities and notes evidencing the same, including documentary stamp taxes;

(f) join with Bank in executing one or more financing statements, notices, affidavits, or similar instruments in form satisfactory to Bank, and such other instruments as Bank may from time to time request, and pay the cost of filing the same in any public office deemed advisable by Bank;

(g) give Bank immediate written notice of (A) any adverse change in Borrower's financial condition, and (B) all threatened or actual actions, investigations or

proceedings affecting Borrower;

(h) permit Bank or its nominee to examine all of Borrower's records relating thereto at any time and to make extracts therefrom, and to inspect and check the Collateral;

(i) not default under or breach any of the terms, conditions or requirements of any lease under which Borrower is a tenant;

(j) shall, upon written request by Bank, reasonably cooperate with Bank in order to provide Bank with access during the term of the Loan to the dealership's dealer management system; and

(k) provide such other information as Bank may from time to time reasonably request.

12. Representations and Warranties of Borrower. Borrower hereby represents and warrants to Bank that:

(a) Borrower is a corporation duly organized under the laws of the State of Florida and its status is active;

(b) Borrower has all the power necessary to own assets;

(c) the execution of this Agreement and the documents referred to herein have been duly authorized by the requisite corporate action;

(d) the person signing for the Borrower has been duly authorized to do so; and

(e) in connection with each of Borrower's Accounts: (i) to the best of Borrower's knowledge and belief, each Account represents a bona fide complete transaction; (ii) the title of Borrower to the Account and, except as against the purchaser, to any goods, is absolute; (iii) the Account has not been transferred to any other person, and no person, except Borrower and the Bank, has any claim thereto, or, with the sole exception of purchaser, to the goods; (iv) no meritorious setoff or counterclaim to such Account has been asserted to the best of Borrower's knowledge and belief and no agreement has been made with any person under which any deduction or discount may be claimed, except regular discounts allowed by Borrower for prompt payment;

(f) in connection with Borrower's Inventory, Borrower is and will be the absolute owner thereof;

(g) Borrower is not a party to any agreement which, by its terms or by operation of law, would conflict with this Agreement;

(h) the location where Borrower keeps its Financed Inventory is and will be 3805 S State Roay 7, West Park, FL 33023 and 1301 South Orange Blossom Trail, Orlando, FL 32805 (the "**Dealer Location**"), subject to the terms of the Post Closing Agreement, and the office where it keeps its records concerning all of its Accounts is at the address stated in the

preamble of this Agreement; and Borrower shall not be permitted to change the Dealer Location without the prior written consent of Bank;

(i) Bank's security interest in the Collateral shall at all times be a first priority security interest;

(j) no material employee benefit plan maintained by Borrower (or any of its subsidiaries or affiliates) which is subject to Part 3 of Subtitle B of Title I of The Employee Retirement Income Security Act of 1974, as amended (hereafter referred to as "ERISA") had a material accumulated funding deficiency (as defined in §302 of ERISA) as of the last day of the most recent fiscal year of such plan, or would have had such a deficiency if such year was the first year of such plan;

(k) no material liability to the Pension Benefit Guaranty Corporation has been or is expected by Borrower (or its subsidiaries or affiliates) to be incurred with respect to any such plan;

(l) Borrower is not required to contribute to a multi-employer pension plan (as defined in the Multi-employer Pension Plan Amendments Act of 1980) and has no withdrawal liability (as defined in such Act) to any multi-employer pension plan;

(m) as of the date hereof, no material adverse change in the Borrower's financial condition has occurred from the date of the Borrower's most recent fiscal year-end financial statements that have been delivered to the Bank; and

13. Insurance. Borrower shall, at Borrower's expense, acquire and at all times maintain one or more policies of insurance covering Borrower's Financed Inventory in such amounts, covering such risks and with such insurance companies as may be satisfactory to Bank from time to time. In no event shall the amount of replacement value insurance be less than the amount of the Note. Bank shall be named as loss payee under such policy by Florida standard or Union standard endorsement. Certificates evidencing such insurance shall be delivered to Bank. The policy and certificate shall provide that the policy is not cancelable on less than ten (10) days' notice to Bank. If Borrower fails to obtain and pay for insurance as provided herein, then Bank may pay the premiums or acquire insurance from another source and insure the interests of Bank and Borrower or insure only the interests of Bank, without waiving or affecting any rights under this Agreement. Every payment for insurance made by Bank shall bear interest from the date thereof at the Default Rate (as defined in the Floor Plan Note) and each such payment and interest thereon shall be secured by this Agreement. Bank shall be entitled to retain and receive all experience rating credits which may accrue under or in connection with any insurance which is procured by Bank pursuant to the authorization contained herein.

14. Annual Review Fee. Each year during the term of the Loan, Borrower shall pay to Bank an annual review fee in the amount of $12,500.

15. Collections. Bank shall have the right at any time and from time to time, without notice to the Borrower to: (a) endorse all items of payment which may come into Bank's possession or control payable to Borrower; (b) make exchanges, substitutions or surrenders of Collateral; (c) insure Financed Inventory to Bank's satisfaction if Borrower fails to do so and pay

for the same, and pay for the account of Borrower, any taxes, levies or other charges affecting Borrower's Financed Inventory or upon or on account of this Agreement or any Liability or any writing evidencing any Liability, which Borrower fails to pay, and any such payment shall constitute a Liability of Borrower; (d) notify purchasers that Accounts have been assigned to Bank, collect all Accounts in Bank's or Borrower's name, and take control of any cash or noncash proceeds of Accounts and of any Financed Inventory; (e) compromise, extend or renew any account or deal with the same as it may deem advisable; and (f) inspect the place of business of Borrower from time to time upon demand.

16. An Event of Default shall occur under this Agreement if: (a) at any time any warranty, representation, certificate or statement of Borrower is not true when made in any material respect, (b) any Liability or any part or installment thereof or interest thereon is not paid within ten (10) days of the date when due on any principal or interest due under the note or within twenty (20) days of the date when due on any other liability or obligation to bank, (c) any event of default as defined in any other Loan Documents should occur which remains uncured beyond all applicable notice and cure periods, (d) if Borrower should fail to observe or perform any agreement or term hereof or any other Loan Documents if Borrower's failure continues for a period of thirty (30) days following receipt of written notice from the Bank, (e) compromise, extend or renew any account or deal with the same as it may deem advisable; and (f) inspect the place of business of Borrower from time to time upon demand.

17. Use of Collateral. Until the occurrence of an Event of Default, Borrower may: (a) use its Financed Inventory in any lawful manner not inconsistent with this Agreement and the terms of any insurance thereon; (b) sell its Financed Inventory in the ordinary course of business; and (c) use and consume any raw materials and supplies, the use and consumption of which is necessary to carry on Borrower's business.

18. Location of Financed Inventory. Borrower agrees not to remove or permit the removal of any Financed Inventory from the Dealer Location without the prior written consent of the Bank or transfer, dispose of or illegally or improperly use said Financed Inventory.

19. Conditions Precedent. Prior to any advance being made under this Agreement:

(a) the Borrower shall execute and deliver to Bank the Note;

(b) the Borrower shall deliver to Bank evidence of insurance in accordance with paragraph 13;

(c) the Borrower shall deliver to Bank a copy of Borrower's dealer license and occupational license;

(d) the Borrower shall deliver to Bank a properly filed fictitious name affidavit, if necessary;

(e) the Borrower shall deliver to the Bank such UCC-3 termination statements and/or other documents or instruments necessary to enable the Borrower to grant to the Bank a first priority security interest in all Collateral;

(f) the Borrower shall deliver to the Bank a Secretary's Certificate and a Certificate of Resolution of Board of Directors in form and substance acceptable to the Bank; and

20. UCC-1 Terminations. Within forty-five (45) days from the date hereof, the Borrower shall provide evidence that the following UCC-1's have been terminated:

(a) UCC-1 in favor of Global Merchant Cash Inc (202401703673);

(a) UCC-1 in favor of Global Merchant Cash Inc (202303519576).

(b) UCC-1 in favor of Automotive Finance Corp (202108796328);

(c) UCC-1 in favor of Walt LLC (202300146287);

(d) UCC-1 in favor of Reyna Capital Corporation (202300358458)

21. Default and Remedies. Borrower shall be in default under this Agreement (each, an "Event of Default") if: (a) at any time any warranty, representation, certificate or statement of Borrower is not true, (b) any Liability or any part or installment thereof or interest thereon is not paid when due, (c) any event of default as defined in the Note or any other loan documents, agreements or instruments executed in connection with the Loan or evidencing the Liability held by Bank (collectively, the "Loan Documents") should occur, (d) if Borrower should fail to observe or perform any agreement or term hereof or in any other Loan Document, (e) [intentionally deleted]; (f) the Borrower shall make an assignment for the benefit of creditors, file a petition in bankruptcy, petition or apply to any tribunal for the appointment of a custodian, receiver or trustee for any of them or a substantial part of their assets, or shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, or if there shall have been filed any such petition or application, or any such proceeding shall have been commenced against any of them, in which an order for relief is entered or which remains undismissed for a period of ninety (90) days or more, (g) the Borrower shall have concealed, removed, or permitted to be concealed or removed, any part of its or his properties, with intent to hinder, delay or defraud its creditors or any of them, or made or suffered a transfer of any of its or his properties which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, or shall have made any transfer of its or his properties to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid, or shall have suffered or permitted, while insolvent, any creditor to obtain a lien upon any of its or his properties through legal proceedings or distraint which is not vacated (or disposed of in a manner approved by the Bank by the posting of appropriate bonds or otherwise) within thirty (30) days from the date thereof, or (h) there shall be any change in the present ownership (directly or indirectly) or management of the Borrower or change in ownership structure of Borrower (directly or indirectly). Upon the occurrence of an Event of Default, then: (i) Borrower's rights, if any, to any further advances or loans hereunder shall immediately terminate; (ii) Bank may, at its option, thereupon or thereafter declare all Liabilities of Borrower to Bank, or any of them selected by Bank (notwithstanding any provisions thereof) immediately due and payable without demand or notice of any kind and the same thereupon shall immediately become and be due and payable

without demand or notice (but with such adjustments, if any, with respect to interest or other charges as may be provided for in the promissory note or other writing evidencing any Liability) and such liabilities shall thereafter accrue interest at the highest rate permitted by law; (iii) in addition to any other rights and remedies which Bank may have, Bank shall have and may exercise immediately and without demand, any and all the rights and remedies granted to a secured party upon default under the Uniform Commercial Code or any other remedy available under law (including, without limitation, repossession of any collateral with or without resort to judicial proceedings and without any requirement to give Borrower any prior notice of such actions); (iv) upon the request or demand of Bank, Borrower shall, at Borrower's expense, immediately assemble the Collateral and make it available to Bank in order to allow it to take possession at a convenient place acceptable to Bank; (v) Borrower shall immediately execute and deliver to Bank any and all instruments, documents, certificates of title, or any similar items which Bank, in its sole discretion, deems necessary to dispose of said Financed Inventory and Borrower hereby appoints Bank its attorney in fact to execute, sign and seal any and all instruments, documents, certificates of title or any similar items which the Bank, in its sole discretion, deems necessary to dispose of the Collateral after an Event of Default; and (vi) Borrower shall pay to Bank on demand any and all costs and expenses, including legal expenses and reasonable attorneys' fees, including costs, expenses and reasonable attorneys, fees on appeal, incurred or paid by Bank in protecting and enforcing Liabilities and the right of Bank hereunder, including Bank's right to take possession of the Collateral and to hold, prepare for sale, sell and dispose of the Collateral, whether or not a lawsuit is instituted. Any notice of sale, disposition or other intended action by Bank, sent to Borrower at the address of Borrower as may from time to time be shown on Bank's records, at least seven (7) days prior to such action, shall constitute reasonable notice to Borrower although a shorter period of notice may also be reasonable. It shall be commercially reasonable for Bank to sell the Collateral on a wholesale basis to a dealer or dealers in new or used property of like kind to the Collateral, or to sell to a purchaser directly or through a dealer in such new or used property; but the enumeration of the foregoing methods of disposition are without limitation on Bank's right to dispose of the Collateral by any other manner or method (whether by sale, lease or otherwise) in a commercially reasonable manner. Bank shall have the right to apply all or any part of any surplus if any, from disposition of the Collateral to (or to hold same as a reserve against) all or any Liabilities of Borrower to Bank, whether or not they, or any of them, be then due, and in such order of application as Bank may from time to time elect.

22. Cross-Default and Cross-Collateral. If Borrower or an Affiliate of Borrower or any guarantor commits a default under any other present or future loan agreement, promissory note, or similar documentation evidencing a loan from Bank to Borrower (or an Affiliate or any guarantor), or any other undertaking or other agreement with: (i) Bank; or (ii) any other lender, whether or not related to the transactions contemplated by this Agreement or the Loan Documents. It is further understood and agreed that a default by Borrower under this Agreement or under any Loan Document shall also constitute a default under any other loan agreement, undertaking or other agreement between Borrower or an affiliate thereof and/or Bank.

23. Waiver. Borrower waives: (a) protest of all commercial paper at any time held by Bank on which Borrower is in any way liable; (b) notice of nonpayment at maturity of any and all accounts; and (c) except where required hereby, notice of action taken by Bank. No waiver by Bank of any Event of Default shall operate as a waiver of any other Event of Default or of the

same Event of Default on a future occasion. No delay or omission on the part of Bank in exercising any right or remedy shall operate as waiver thereof, and no single or partial exercise by Bank of any right or remedy shall preclude or affect any other or further exercise thereof or the exercise of any other right or remedy.

24. Subordination of Debt. All stockholder and related entity and affiliate debt shall be subordinated to all debt owed to Bank. Borrower will execute such subordination agreements and other documents as Bank may require to evidence such subordination.

25. Clear Title to Motor Vehicles. Borrower shall clear all prior title, security interests and liens, including the documentation thereof on any Certificate of Title relating to any motor vehicle acquired by Borrower.

26. Landlord Waivers. Borrower shall execute and shall cause any landlord to execute, a Landlord's Waiver agreement (waiving the landlord's lien rights to Borrower's personal property) for any existing or future Dealer Location.

27. Financing Sources. Bank will be the sole source of floor plan financing for any line or type of motor vehicle for Borrower.

(a) Depository Relationship. As a pre-condition to the Line of Credit, Borrower covenants and agrees to at all times pertinent herein maintain its primary operating account at the Bank, as well a separate floor plan funding account, a cash collateral account and an account for wires/ACH's and payroll (if different from the operating account) for the life of the Loan. All advances from the Line of Credit shall be deposited into Borrower's operating account at the Bank and Borrower shall cause all third party funding (checks, ACHs and wires) to be deposited into Borrower's cash collateral account at the Bank. Borrower further agrees to pay the Bank any and all fees and charges normally associated with said type of accounts, pursuant to the Bank's schedule of fees and services, as published from time to time.

28. Successors and Assigns. All rights of Bank hereunder shall inure to the benefit of Bank's successors and assigns. All obligations of Borrower shall bind the successors and assigns of Borrower.

29. Termination. This Agreement may be terminated by Borrower by the payment of all Liabilities under the Line of Credit, if not earlier terminated as provided herein. Bank may terminate this Agreement upon written notice to Borrower, mailed or delivered to the Borrower's address shown in the preamble of this Agreement or to the last known address of the Borrower or other party to whom such notice is addressed, shown on the records of the Bank or otherwise known. Upon termination, Bank shall be under no obligation to make further advances hereunder. Termination of this Agreement shall not in any way affect the rights and liabilities of the parties hereunder relating to loans made and Accounts, Financed Inventory or other Collateral pledged prior to the date specified in such notice.

30. Costs and Expenses. Borrower shall pay upon demand: (a) all costs and expenses arising out of or in connection with this Agreement, including documentary stamp taxes, filing and recording fees; and (b) all service and administrative fees as may be charged by Bank from time to time in connection with this Agreement, including Bank's customary fee for processing

trust receipts.

31. Miscellaneous.

(a) Time of Essence. Time is of the essence of this Agreement.

(b) Cumulative Effect. The provisions of this Agreement are cumulative and in addition to the provisions of any liability and any note or other writing evidencing any Liability secured by this Agreement, and Bank shall have all the benefits, rights, and remedies of any liability and any note or other writing evidencing any Liability secured hereby.

(c) Usage. The singular pronoun when used herein, shall include the plural, and the neuter shall include the masculine and feminine.

(d) Governing Law. This Agreement shall be construed in accordance with the laws of Florida. The parties further agree that in any dispute between them relating to this Loan and Security Agreement, exclusive jurisdiction shall be in the trial courts located within Miami-Dade County, Florida, any objections as to jurisdiction or venue in such court being expressly waived. THE PARTIES HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING HEREUNDER OR RELATING TO THIS AGREEMENT WHETHER IN CONTRACT, TORT OR STATUTE.

(e) Severability. Wherever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provisions of this Agreement shall be prohibited by or invalid under applicable law, such provisions shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(f) Notices. Any notice to be given hereunder by either party to the other may be effected either by personal delivery in writing, by telecopy or by mail, registered or certified, postage prepaid with return receipt requested. Mailed notices shall be addressed to the parties at the addresses appearing in the preamble to this Loan and Security Agreement, but each party may change its address by written notice in accordance with this paragraph.

(g) Paragraph Headings. The paragraph headings used herein are for convenience of reference only and shall not be considered to expand, limit or otherwise construe the terms of this Agreement.

(h) Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument.

(i) Prior Understandings. This Loan and Security Agreement supersedes all prior understandings and agreements, whether written or oral, among the parties hereto relating to the transactions provided for herein. None of the terms or provisions hereof may be amended, supplemented, waived or changed orally, but only by a writing signed by the parties hereto.

(j) Indemnification. Borrower shall indemnify, defend and hold Bank, its officers, directors, employees and representatives harmless from, against and with respect to any damage, liability, claim, loss, penalty, fine, or amount paid in settlement, and any expense, including attorney's fees, and other costs, fees and expenses for any proceeding (whether mediation, arbitration or civil or criminal litigation) at the trial and appellate levels, and for collection or enforcement of any judgment award or other relief granted, and those arising from the enforcement of this indemnity provision (collectively referred to as "Damages"), occasioned by, arising out of, or resulting from, either directly or indirectly; (i) any and all claims against and liabilities of Borrower of every kind, nature and description, absolute and contingent, arising from or in any way connected with the business and operations of Borrower whether occurring before or after the date of this Agreement; (ii) any claims against Bank by any third party relating to the Borrower's business and operations, and (iii) any untrue representation or warranty or breach of any representation or warranty or covenant of Borrower contained in this Agreement. The indemnity provided by Borrower shall survive the termination of this Agreement and payment and satisfaction of all Liabilities.

(k) Power of Attorney. Borrower hereby irrevocably constitutes and appoints Bank and its authorized officers and attorneys-in-fact of each, as its true and lawful agent and attorney-in-fact, with full power and authority, to: a) receive, endorse, cash, collect and or negotiate any check, or other instrument of payment, including, but not limited to, any payments received from a Chapter 7 and/or Chapter 13 bankruptcy trustee (the "Receivables"); b) take any and all steps to repossess the Collateral and sign title and court documents with respect to same; c) place, enforce, release, modify and transfer the rights and interests granted to Borrower with respect to the Collateral, including, but not limited to, rights with respect to insurance policies, motor vehicles, certificate of title and motor vehicle liens; d) to endorse checks payable to Borrower from insurance carriers in payment of casualty insurance claims arising from any Collateral; e) execute, swear to, acknowledge, deliver, file and record in the appropriate public offices all certificates, documents and other instruments that Bank deems appropriate or necessary to effect any of the foregoing or its rights hereunder; and f) take any and all further action as may be required with respect to the Collateral. The foregoing power of attorney is hereby declared to be irrevocable and a special power coupled with an interest.

[SIGNATURES ON FOLLOWING PAGE]

Agreed to as of the date first set forth above.

Witness: Veronica Hernandez

**"BANK"**

**OCEAN BANK**

By: ______________________
Name: Sauro Perez
Title: VP @ Branch manager

**"BORROWER"**

**BENJI AUTO SALES CORP.,**
a Florida corporation

By: ______________________
**Benji Urra, President**

Witness: ______________________

Agreed to as of the date first set forth above.

**"BANK"**

**OCEAN BANK**

By:________________________________
Name:
Title:

Witness: Raybel lopez

**"BORROWER"**

**BENJI AUTO SALES CORP.,**
a Florida corporation

By:________________________________
**Benji Urra, President**

Witness: Bianca fernandez

EXHIBIT "A"

LOAN AND SECURITY AGREEMENT BY AND BETWEEN OCEAN BANK AND BENJI AUTO SALES CORP.

<u>Payment Due Date</u>

The Borrower will be required to make partial principal curtailment payments with respect to any Financed Inventory purchased for resale, as follows:

(i) After the vehicle has been subject to the Loan for one hundred twenty (120) days, the Borrower will make a twenty percent (20%) curtailment payment (i.e, 20% of the total original amount advanced against the vehicle), and (ii) shall continue to make another twenty percent (20%) curtailment (based on the original amount advanced against the vehicle) each month thereafter.

Payment of outstanding principal amount financed due in full on or before (i) nine (9) months from the finance date (the date Bank advanced Loan proceeds against the vehicle), (ii) fifteen (15) business days from the sale of a vehicle, or (iii) twenty-four (24) hours after the Borrower receives the proceeds for the vehicle.

No Motor Vehicle Inventory is eligible to be re-floored once subject to curtailment payments.

# Exhibit C

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

FLORIDA SECURED TRANSACTION REGISTRY

FILED

2025 Apr 21 03:25 PM

****** 202500995044 ******

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON

B. Email Address ngreen@platinumfilings.com

C. SEND ACKNOWLEDGEMENT TO:
Name Platinum Filings, LLC

Address 99 W. Hawthorne Ave.

Address Suite 408

City/State/Zip Valley Stream, NY 11580

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (**1a OR 1b**) – Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 1.a ORGANIZATION'S NAME<br>Benji Auto Sales Corp. | | | | | |
| 1.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1.c MAILING ADDRESS Line One<br>3805 South State Road 7 | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY<br>West Park | STATE<br>FL | POSTAL CODE<br>33023 | | COUNTRY<br>USA |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – INSERT ONLY **ONE** DEBTOR NAME (2a **OR** 2b) – Do Not Abbreviate or Combine Names

| | | | | | |
|---|---|---|---|---|---|
| 2.a ORGANIZATION'S NAME | | | | | |
| 2.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2.c MAILING ADDRESS Line One | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – INSERT ONLY **ONE** SECURED PARTY (**3a OR 3b**)

| | | | | | |
|---|---|---|---|---|---|
| 3.a ORGANIZATION'S NAME<br>Ocean Bank | | | | | |
| 3.b INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3.c MAILING ADDRESS Line One<br>780 N.W. 42nd Avenue | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY<br>Miami | STATE<br>FL | POSTAL CODE<br>33126-5597 | | COUNTRY<br>USA |

**4.** This **FINANCING STATEMENT** covers the following collateral:

ALL OF DEBTOR'S ASSETS.

5. ALTERNATE DESIGNATION (if applicable)
- [ ] LESSEE/LESSOR
- [ ] CONSIGNEE/CONSIGNOR
- [ ] BAILEE/BAILOR
- [ ] AG LIEN
- [ ] NON-UCC FILING
- [ ] SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** – YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

- [x] All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
- [ ] Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA**

FOR FILING WITH THE FSTR.

# Exhibit D

**ALL FLORIDA DOCUMENTARY STAMP TAX AND INTANGIBLE TAX DUE IN CONNECTION WITH THE PROMISSORY NOTE HAS BEEN PAID AND EVIDENCE OF SUCH PAYMENT APPEARS ON THE MORTGAGE BEING RECORDED ON OR ABOUT THE DATE HEREOF IN THE PUBLIC RECORDS OF MONROE COUNTY, FLORIDA.**

# DEMAND LINE OF CREDIT PROMISSORY NOTE

$5,000,000.00 April 17, 2025

Miami, Florida

FOR VALUE RECEIVED, BENJI AUTO SALES CORP., a Florida corporation (the "**Borrower**"), hereby promises to pay to the order of OCEAN BANK (the **"Bank"**) ON DEMAND, at its offices at 780 N.W. 42nd Avenue, Miami, Florida 33126, or such other place as Bank shall designate in writing from time to time, the principal sum of Five Million No/100 Dollars ($5,000,000.00) (the **"Loan")**, or so much thereof as shall be advanced pursuant to terms and conditions of the Loan and Security Agreement by and between Borrower and Bank as of the date hereof (as the same may be amended, modified, extended, supplemented, renewed, replaced and/or restated from time to time the "**Credit Agreement** "), in United States Dollars, together with interest thereon as hereinafter provided.

1. **INTEREST RATE**.

(a) The unpaid principal balance of this Demand Line of Credit Promissory Note (this "**Note**") from day to day outstanding, which is not past due, shall bear interest at a fluctuating rate of interest equal to the greater of (A) three quarters of one percent (0.75%) plus the Prime Rate, or (B) 8.25% (the "**Floor Rate**"). Each time the Prime Rate changes, the per annum rate of interest for the Loan shall change immediately and contemporaneously with such change in the Prime Rate; provided, however, the interest rate shall never be less than the Floor Rate. Interest shall be computed for the actual number of days which have elapsed, on the basis of a 360-day year and shall be payable in arrears. The interest rate applicable to the Loan, as adjusted from time to time, is hereinafter referred to as the "**Applicable Interest Rate**".

(b) The term "Prime Rate" means, the "Prime Rate" as published in The Wall Street Journal's "Money Rates" table for that day ("**WSJ Prime Rate**"). If multiple WSJ Prime Rates are quoted in such table, then the highest WSJ Prime Rate quoted therein shall be the rate used for part (a) of this interest rate adjustment calculation. In the event that a Prime Rate is no longer published in The Wall Street Journal's "Money Rates" table, then Bank will choose a substitute index rate to use for the above part (a) of the interest rate adjustment calculation, which substitute index rate shall be based on comparable information to the WSJ Prime Rate. The initial Applicable Interest Rate and each adjusted Applicable Interest Rate may not be the lowest rate of interest that Bank charges its customers other than Borrower.

2. **PAYMENT OF PRINCIPAL AND INTEREST**.

Borrower shall make payments of principal and interest as follows:

(a) Interest only on the outstanding principal balance shall be due and payable in arrears continuing on May 17, 2025, and on the same day of each month thereafter.

(b) Principal curtailment payments in accordance with the terms and conditions of the Credit Agreement.

(c) The entire unpaid principal amount hereof, together with accrued and unpaid interest thereon and all other amounts payable hereunder shall be due and payable in full ON DEMAND by Bank. The "**Maturity Date**" of this Note is the date Lender makes demand hereon as provided above.

3. **APPLICATION OF PAYMENTS**. Except as otherwise specified herein, each payment or prepayment, if any, made under this Note shall be applied to pay late charges, accrued and unpaid interest, principal, and any other fees, costs and expenses which Borrower is obligated to pay under this Note, in such order as Bank may elect from time to time in its sole discretion.

4. **TENDER OF PAYMENT**. All payments on this Note are payable on or before 1:00 p.m. on the due date thereof, at the office of Bank specified above and shall be credited on the date the funds become available lawful money of the United States. All sums payable to Bank which are due on a day on which Bank is not open for business shall be paid on the next succeeding business day and such extended time shall be included in the computation of interest.

5. **DEBT SERVICE COVERAGE RATIO**.

(a) Borrower maintain a debt service coverage ratio (as determined by Bank) of at least 1.25 to 1 for the life of the Loan. The debt service coverage ratio shall be measured by, for the trailing four quarter period ending on the date of determination, Borrower's EBITDA (as determined in accordance with GAAP) + the sum of (in each case, without duplication): (i) provision for taxes based on income, profits or capital of Borrower for such period, (ii) the interest portion of Debt Service payments for such period (iii) depreciation and amortization expenses of Borrower for such period, and (iv) non-recurring or one-time expenses, non-cash items, accounting charges, etc., at the Bank's discretion. For purposes of this paragraph, the term "**Debt Service**" means, for any period, all interest and principal payments for such period due in respect of any of Borrower 's obligations for borrowed money (whether direct or contingent) or other indebtedness, including, without limitation, any equipment financing leases or conditional sale or other title retention agreements. This ratio shall be tested annually and be based on fiscal year-end financial statements for such period. .

(B) If Borrower fails to satisfy the requirements set forth in this Section 5, such failure shall be an Event of Default.

6. **PREPAYMENT**. The principal amount of this Note may be prepaid in whole or in part at any time, and from time to time, without premium or penalty. Any prepayment shall include accrued and unpaid interest (including interest which as accrued at the Default Rate, as hereinafter defined) to the date of prepayment on the principal amount prepaid and all other sums due and payable hereunder.

7. **SECURITY FOR THE NOTE.**

7.1. This Note is executed and delivered in accordance with a commercial transaction. As security for the payment of the monies owing under this Note, Borrower has delivered or has caused to be delivered to Bank the following (each, a **"Loan Document"** and collectively with this Note, the Credit Agreement, and any other guaranty, document, certificate or instrument executed by Borrower or any other obligated party in connection with the Loan, together with all amendments, modifications, renewals or extensions thereof, the **"Loan Documents"**): (a) the Credit Agreement, (b) a Guaranty Agreement dated as of even date herewith by Benji Urra and Angela Elena Urra, each in their individual capacity (collectively, the "**Guarantor**") as amended from time to time, and (c) a Second Mortgage and Security Agreement by Benji Urra and Angela Elena Urra in favor of Bank to be recorded in the Public Records of Monroe County, Florida (the **"Mortgage"**) on certain real property and the improvements situated thereon in Monroe County, Florida, as more fully described in the Mortgage (the **"Property"**).

7.2. Borrower hereby grants to Bank a continuing security interest in all property of Borrower, now or hereafter in the possession of Bank, as security for the payment of this Note and any other liabilities of Borrower to Bank, which security interest shall be enforceable and subject to all the provisions of this Note, as if such property were specifically pledged hereunder.

8. **DEFAULT RATE**. From and after the Maturity Date or from and after the occurrence of an Event of Default hereunder, irrespective of any declaration of maturity, all amounts remaining unpaid or thereafter accruing hereunder, shall, at Bank's option, bear interest at the highest permissible rate under applicable usury law (or, if no such rate is specified by applicable law, 25% per annum) (the "**Default Rate**"). Such default rate of interest shall be payable upon demand, but in no event later than when scheduled interest payments are due, and shall also be charged on the amounts owed by Borrower to Bank pursuant to any judgments entered in favor of Bank with respect to this Note. Without limiting the generality of the foregoing, if any payment is not received by Bank on/or before ten (10) days after the due date, then the interest rate shall automatically increase to the Default Rate and will remain at the maximum rate then permitted by applicable law until the payments are completely brought up to date and current.

9. **REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Bank as follows as of the date hereof:

9.1. **Organization, Powers.** The Borrower (i) is a corporation, duly incorporated, validly existing and in good standing under the laws of the state of its organization, and is authorized to do business in each other jurisdiction wherein its ownership of property or conduct of business legally requires such authorization; (ii) has the power and authority to own its properties and assets and to carry on its business as now being conducted and as now

contemplated; and (iii) has the power and authority to execute, deliver and perform, and by all necessary action has authorized the execution, delivery and performance of, all of its obligations under each Loan Document to which it is a party.

9.2. **Execution of Loan Documents.** Each of the Loan Documents to which Borrower is a party has been duly executed and delivered by Borrower. Execution, delivery and performance of each of the Loan Documents to which Borrower is a party will not: (i) violate any of its organizational documents, provision of law, order of any court, agency or other instrumentality of government, or any provision of any indenture, agreement or other instrument to which it is a party or by which it or any of its properties is bound; (ii) result in the creation or imposition of any lien, charge or encumbrance of any nature, other than the liens created by the Loan Documents; and (iii) require any authorization, consent, approval, license, exemption of, or filing or registration with, any court or governmental authority.

9.3. **Obligations of Borrower.** Each of the Loan Documents to which Borrower is a party is the legal, valid and binding obligation of Borrower, enforceable against it in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally. Borrower is obtaining the Loan for commercial purposes.

9.4. **Litigation.** There is no action, suit or proceeding at law or in equity or by or before any governmental authority, agency or other instrumentality now pending or, to the knowledge of Borrower, threatened against or affecting Borrower or any of its properties or rights which, if adversely determined, would materially impair or affect: (i) the value of any collateral securing this Note; (ii) Borrower's right to carry on its business substantially as now conducted (and as now contemplated); (iii) its financial condition; or (iv) its capacity to consummate and perform its obligations under the Loan Documents to which Borrower is a party.

9.5. **No Defaults.** Borrower is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained herein or in any material agreement or instrument to which it is a party or by which it or any of its properties is bound after the expiration of applicable notice, cure and grace periods.

9.6. **No Untrue Statements.** No Loan Document or other document, certificate or statement furnished to Bank by or on behalf of Borrower contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading. Borrower acknowledges that all such statements, representations and warranties shall be deemed to have been relied upon by Bank as an inducement to make the Loan to Borrower.

10. **COVENANTS**

10.1 **Accounts**. Borrower shall maintain its primary operating account for the life of the Loan (in which all third party payments are to be deposited).

10.2. **Financial Statements; Compliance Certificate**.

10.2.1. Borrower shall furnish to Bank the following financial information, in each instance prepared in accordance with generally accepted accounting principles consistently applied:

(a) Not later than April 30 of each year, annual corporate financial statements of Borrower including, without limitation, statements of financial condition, income and cash flows, a reconciliation of net worth, a listing of all contingent liabilities, notes to financial statements, and any other information requested by Bank, certified and signed by an appropriate officer of the Borrower.

(b) Not later than twelve (12) months from the date of the last furnished personal financial statements, annual personal financial statements of each Guarantor including, without limitation, statements of financial condition, a listing of real estate holdings (including percentage of ownership and ownership status), income and cash flows, a reconciliation of net worth, a listing of all contingent liabilities, notes to financial statements, sufficient data to conduct a Global Cash Flow Assessment, and any other information requested by Bank, certified and signed by the Guarantor.

(c) As soon as available, and in no event later than thirty (30) days after filing with the Internal Revenue Service (but no later than November 15th for Guarantors and October 15th for Borrower), a true and complete copy of the federal tax returns, including all schedules, of Borrower and of Guarantor, and any request for an extension of the filing date thereof.

(d) Such other information respecting the operations of Borrower, Guarantor and/or the Property or other collateral securing the Loan as Bank may from time to time reasonably request.

10.2.2. Borrower shall furnish to Bank, with each set of financial statements described herein, a compliance certificate signed by Borrower's chief financial officer certifying that to its knowledge: (i) all representations and warranties of Borrower set forth in this Note or any other Loan Document remain true and correct, in all material respects, as of the date of such compliance certificate; (ii) none of the covenants of Borrower contained in this Note or any other Loan Document has been materially breached; and (iii) no event has occurred which constitutes an Event of Default (or which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) under this Note or any other Loan Document. In addition, Borrower shall promptly notify Bank of the occurrence of any default (after the expiration of the applicable notice, grace and cure period), Event of Default, adverse litigation or material adverse change in its financial condition.

10.2.3. Guarantor shall furnish to Bank, with each set of financial statements described herein, a compliance certificate signed by Guarantor certifying that to its knowledge: (i) all representations and warranties of Guarantor set forth in this Note or any other Loan Document remain true and correct, in all material respects, as of the date of such compliance certificate; (ii)

none of the covenants of Guarantor contained in this Note or any other Loan Document has been materially breached; and (iii) to its knowledge, no event has occurred which constitutes an Event of Default (or which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) under this Note or any other Loan Document. In addition, Guarantor shall promptly notify Bank of the occurrence of any default (after the expiration of the applicable notice, grace and cure period), Event of Default, adverse litigation or material adverse change in its financial condition.

10.3. **Limitation on Salary or Dividends**. During the continuance of an Event of Default (or upon the occurrence of a default, which with the giving of notice or the passage of time, or both, would constitute Event of Default), Borrower shall not pay a salary or dividend or otherwise make any payment of any nature to or for the benefit of any member of Borrower. Any distributions of Borrower to any members or shareholders shall not exceed 75% of fiscal year net income, as determined by Bank.

10.4. **Indemnification**.

10.4.1. Borrower hereby indemnifies and agrees to defend and hold harmless Bank, its officers, employees and agents, from and against any and all losses, damages, or liabilities and from any suits, claims or demands, including reasonable attorneys' fees incurred in investigating or defending such claim, suffered by any of them and caused by, arising out of, or in any way connected with the Loan Documents or the transactions contemplated therein (except to the extent determined by a final judgment of a court of competent jurisdiction to have been caused by the gross negligence or willful misconduct of any of the indemnified parties) including, without limitation: (i) on account of any act or omission to act by Bank in connection with any collateral for this Note; (ii) losses, damages (including consequential damages, but excluding punitive damages), expenses or liabilities sustained by Bank in connection with any collateral for this Note; (iii) any untrue statement of a material fact contained in information submitted to Bank by Borrower or the omission of any material fact necessary to be stated therein in order to make such statement not misleading or incomplete; (iv) the failure of Borrower to perform any obligations herein required to be performed by Borrower; (v) the ownership, construction, occupancy, operation, use or maintenance of any collateral for this Note; (vi) disputes with any architect, general contractor, subcontractor, materialman or supplier, or on account of any act or omission to act by Bank in connection with the Property; (vi) losses, damages (including consequential damages), expenses or liabilities sustained by Bank in connection with any environmental inspection, monitoring, sampling or cleanup of the Property required or mandated by any applicable environmental law; and (viii) claims by any tenant or any other party arising under or in connection with any lease of all or any portion of the Property.

10.4.2. In case any action shall be brought against Bank, its officers, employees or agents, in respect to which indemnity may be sought against Borrower, Bank or such other party shall promptly notify Borrower and Borrower shall assume the defense thereof, including the employment of counsel selected by Borrower and reasonably satisfactory to Bank, the payment of all costs and expenses and the right to negotiate and consent to settlement. Bank shall have the right, at its sole option, to employ separate counsel in any such action and to

participate in the defense thereof, all at Borrower's sole cost and expense. Borrower shall not be liable for any settlement of any such action effected without its consent (unless Borrower fails to defend such claim), but if settled with Borrower's consent, or if there be a final judgment for the claimant in any such action, Borrower agrees to indemnify and hold harmless Bank from and against any actual loss or liability by reason of such settlement or judgment.

10.4.3. The provisions of this Section 10.4 shall survive the repayment or other satisfaction of the Liabilities.

10.5. **Documentary and Intangible Taxes.** Borrower shall be liable for all documentary stamp and intangible taxes assessed at the closing of the Loan or from time to time during the life of the Loan.

10.6 **Subordinate Financing/Mezzanine Financing**. Borrower shall not incur or permit the incurring of any financing in addition to the Loan that is secured by a lien, security interest or other encumbrance of any part of the collateral for the subject Loan. Neither Borrower nor its constituents shall obtain any mezzanine or other secondary financing. Any loans between members of Borrower and Borrower shall be subject to the prior written consent of Bank, and if permitted by Bank, shall be subordinate in all respects with the repayment of the Loan Additionally, Borrower shall not be permitted to take on any additional indebtedness in excess of $100,000 without the Bank's prior written consent. Notwithstanding the foregoing, Borrower shall be permitted to maintain the existing loan in favor of Quick Shift Capital LLC (the "**Subordinate Loan**"), subject to Quick Shift Capital subordinating its lien in the collateral (as defined in the Credit Agreement) to Bank. Borrower shall not execute any amendment of the Subordinate Loan without the prior written consent of Bank, and any default or event of default under the Subordinate Loan shall constitute an Event of Default hereunder. Borrower acknowledges that, notwithstanding that the maximum availability under the Subordinate Loan on the date hereof is $5,000,000, Borrower is not permitted to increase the principal balance over the current outstanding balance (currently approximately $4,558,500). As such outstanding balance is paid down, Borrower may not increase the outstanding principal balance until it is paid down to $3,000,000, at which point the maximum availability under the Subordinate Loan shall be permanently reduced to $3,000,000.

**Borrower acknowledges that the total availability under the Loan shall be capped at $3,441,500 on the date hereof. Such availability shall increase dollar for dollar, as Borrower provides evidence the the outstanding balance under the Subordinate Loan has been reduced, until such time that such balance has been reduced to $3,000,000 and the availability under the Subordinate Loan has been permanently reduced to $3,000,000. Borrower shall at all times comply with the terms of the Subordination and Intercreditor Agreement dated as of even date herewith between Bank, Borrower and Quick Shift (any Event of Default by Borrower thereunder shall be an Event of Default under the Loan Documents).**

10.7 **Ownership and Guaranties**. Throughout the term of the Loan, and at any time within ten (10) business days after written request of Bank, Borrower shall provide Bank with an affidavit or statement, listing all of the current owners of a direct or beneficial interest in the Borrower (including corporation, limited liability company, trust, or partnership) and listing the

current percentage ownership interest owned by each owner. Bank may require that Borrower cause each owner that holds at least fifteen percent (15%) of the total ownership or beneficial interest in the Borrower to fully guaranty the Loan by executing and delivering to Bank a guaranty, on Bank's then current commercial guaranty template. Bank may require that Borrower cause the owners who, in the aggregate comprise at least fifty one percent (51%) of the total ownership or beneficial interests in the Borrower entity to fully guaranty the Loan by causing each such owner to execute and deliver to Bank a guaranty, substantially similar to the guaranty of the Guarantor.

11. **EVENTS OF DEFAULT**. Each of the following shall constitute an event of default hereunder (an "Event of Default"): (a) the failure of Borrower to pay any amount of principal or interest hereunder on or ten (10) days after the date same becomes due and payable; or (b) the occurrence of any other default in any term, covenant or condition hereunder, and the continuance of such breach for a period of thirty (30) days after written notice thereof shall have been given to Borrower; or (c) the occurrence of any Event of Default under the Credit Agreement or any other Loan Document.

12. **REMEDIES**. If an Event of Default exists, Bank may exercise any right, power or remedy permitted by law or as set forth herein or in the Credit Agreement or any other Loan Document including, without limitation, the right to declare the entire unpaid principal amount hereof and all interest accrued hereon, and all other sums secured by the Loan Document, to be, and such principal, interest and other sums shall thereupon become, immediately due and payable.

13. **MISCELLANEOUS**.

13.1. **Disclosure of Financial Information**. Bank is hereby authorized to disclose any financial or other information about Borrower to any regulatory body or agency having jurisdiction over Bank and to any present, future or prospective participant or successor in interest in any loan or other financial accommodation made by Bank to Borrower. The information provided may include, without limitation, amounts, terms, balances, payment history, return item history and any financial or other information about Borrower.

13.2. **Integration**. This Note and the other Loan Documents constitute the sole agreement of the parties with respect to the transaction contemplated hereby and supersede all oral negotiations and prior writings with respect thereto.

13.3. **Attorneys' Fees**. If Bank retains the services of counsel by reason of a claim of a default or an Event of Default hereunder or under any of the other Loan Documents, or on account of any matter involving this Note, or for examination of matters subject to Bank's approval under the Loan Documents, all costs of suit and all reasonable attorneys' fees and such other reasonable expenses so incurred by Bank shall be paid by Borrower, on demand, and shall be deemed part of the obligations evidenced hereby.

13.4. **No Implied Waiver**. Bank shall not be deemed to have modified or waived any of its rights or remedies hereunder unless such modification or waiver is in writing and signed by Bank, and then only to the extent specifically set forth therein. A waiver in one event shall not

be construed as continuing or as a waiver of or bar to such right or remedy in a subsequent event. After any acceleration of, or the entry of any judgment on, this Note, the acceptance by Bank of any payments by or on behalf of Borrower on account of the indebtedness evidenced by this Note shall not cure or be deemed to cure any Event of Default or reinstate or be deemed to reinstate the terms of this Note absent an express written agreement duly executed by Bank and Borrower.

13.5. **Waiver**. Borrower, jointly and severally, waives demand, notice, presentment, protest, demand for payment, notice of dishonor, notice of protest and diligence of collection of this Note. Borrower consents to any and all extensions of time, renewals, waivers, or modifications that may be granted by Bank with respect to the payment or other provisions of this Note, and to the release of any collateral, with or without substitution. Borrower agrees that makers, endorsers, guarantors and sureties may be added or released without notice and without affecting Borrower's liability hereunder. The liability of Borrower shall not be affected by the failure of Bank to perfect or otherwise obtain or maintain the priority or validity of any security interest in any collateral. The liability of Borrower shall be absolute and unconditional and without regard to the liability of any other party hereto.

13.6. **No Usurious Amounts**. Anything herein contained to the contrary notwithstanding, it is the intent of the parties that Borrower shall not be obligated to pay interest hereunder at a rate which is in excess of the maximum rate permitted by law. If by the terms of this Note, Borrower is at any time required to pay interest at a rate in excess of such maximum rate, the rate of interest under this Note shall be deemed to be immediately reduced to such maximum legal rate and the portion of all prior interest payments in excess of such maximum legal rate shall be applied to and shall be deemed to have been payments in reduction of the outstanding principal balance, unless Borrower shall notify Bank, in writing, that Borrower elects to have such excess sum returned to it forthwith. Borrower agrees that in determining whether or not any interest payable under this Note exceeds the highest rate permitted by law, any non-principal payment, including without limitation, late charges, shall be deemed to the extent permitted by law to be an expense, fee or premium rather than interest. In addition, Bank may, in determining the maximum rate of interest allowed under applicable law, as amended from time to time, take advantage of: (i) the rate of interest permitted by Section 687.12 Florida Statues ("Interest rates; parity among licensed lenders or creditors") and 12 United States Code, Sections 85 and 86, and (ii) any other law, rule or regulation in effect from time to time, available to Bank which exempts Bank from any limit upon the rate of interest it may charge or grants to Bank the right to charge a higher rate of interest than allowed by Florida Statutes, Chapter 687.

13.7. **Partial Invalidity**. The invalidity or unenforceability of any one or more provisions of this Note shall not render any other provision invalid or unenforceable. In lieu of any invalid or unenforceable provision, there shall be added automatically a valid and enforceable provision as similar in terms to such invalid or unenforceable provision as may be possible.

13.8. **Binding Effect**. The covenants, conditions, waivers, releases and agreements contained in this Note shall bind, and the benefits thereof shall inure to, the parties hereto and

their respective heirs, executors, administrators, successors and assigns; provided, however, that this Note cannot be assigned by Borrower without the prior written consent of Bank, and any such assignment or attempted assignment by Borrower shall be void and of no effect with respect to Bank.

13.9. **Modifications**. This Note may not be supplemented, extended, modified or terminated except by an agreement in writing signed by the party against whom enforcement of any such waiver, change, modification or discharge is sought.

13.10. **Sales or Participations**. Bank may from time to time sell or assign, in whole or in part, or grant participations in, the Loan, this Note and/or the obligations evidenced thereby. The holder of any such sale, assignment or participation, if the applicable agreement between Bank and such holder so provides, shall be: (a) entitled to all of the rights, obligations and benefits of Bank; and (b) deemed to hold and may exercise the rights of setoff or banker's lien with respect to any and all obligations of such holder to Borrower, in each case as fully as though Borrower were directly indebted to such holder. Bank may in its discretion give notice to Borrower of such sale, assignment or participation; however, the failure to give such notice shall not affect any of Bank's or such holder's rights hereunder.

13.11. **Jurisdiction**. With respect to any legal or equitable suit, action, claim or proceeding arising hereunder or under the other Loan Documents, Borrower: (i) irrevocably submits to the nonexclusive jurisdiction of the United States District Court located in Miami-Dade County, Florida or the Circuit Court of the State of Florida of the located in Miami-Dade County, Florida; (ii) agrees that all such suits, actions, claims or proceedings may be heard and determined in such courts and (iii) irrevocably waives any (A) objection which it may have at any time to the laying of venue of any suit, action, claim or proceeding arising out of or relating to this note or any other loan document brought in any such state or federal court and (B) any claim that any such suit, action, claim or proceeding brought in any such state or federal court has been brought in an inconvenient forum.

13.12. **Notices**. All notices and communications under this Note shall be in writing and shall be given by either (a) hand-delivery, (b) first class mail (postage prepaid), certified, with return receipt requested, or (c) reliable overnight commercial courier (charges prepaid), to the addresses listed in the Credit Agreement. Notice shall be deemed to have been given and received: (i) if by hand delivery, upon delivery; (ii) if by mail, three (3) calendar days after the date first deposited in the United States mail; and (iii) if by overnight courier, on the date of actual delivery, or if delivery is refused, the date of such refusal. A party may change its address by giving written notice to the other party as specified herein.

13.13. **Governing Law**. This Note shall be governed by and construed in accordance with the substantive laws of the State of Florida without reference to conflict of laws principles.

13.14. Intentionally Deleted.

13.15. **Continuing Enforcement**. If, after receipt of any payment of all or any part of this Note, Bank is compelled or agrees, for settlement purposes, to surrender such payment to

any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Note and the other Loan Documents shall continue in full force and effect or be reinstated, as the case may be, and Borrower shall be liable for, and shall indemnify, defend and hold harmless Bank with respect to, the full amount so surrendered. The provisions of this Section shall survive the cancellation or termination of this Note and shall remain effective notwithstanding the payment of the obligations evidenced hereby, the release of any security interest, lien or encumbrance securing this Note or any other action which Bank may have taken in reliance upon its receipt of such payment. Any cancellation, release or other such action shall be deemed to have been conditioned upon any payment of the obligations evidenced hereby having become final and irrevocable.

13.16. **Sanctioned Persons**. The Bank is subject to compliance with laws, statutes, regulations, government orders, decrees and rules relating to anti-money laundering and U.S. sanctions compliance, including, but not limited to, the Bank Secrecy Act and its implementing regulations, as well as the statutes, regulations, executive orders and governmental actions relating to any financial, sectoral, secondary sanctions and trade embargoes administered by the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury of the United States of America (including, those provisions relating to Persons named on OFAC's "Specially Designated Nationals and Blocked Persons List")(collectively, "AML and Sanction Laws"). Borrower, all Persons holding any legal or beneficial interest whatsoever in Borrower and any subsidiary of Borrower are, and shall at all times be, in compliance in all material respects with any and all AML and Sanction Laws applicable to them. Neither Borrower, any Persons holding any legal or beneficial interest whatsoever in Borrower nor any subsidiary of Borrower is included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to or otherwise associated with, in any manner with any party subject to sanctions under any AML and Sanction Laws and is not, and shall not, engage in any dealings or transactions or otherwise be associated with any such party. In addition, Borrower hereby agrees to provide to the Bank with any and all additional information that the Bank deems necessary from time to time in order to ensure compliance with all applicable AML and Sanction Laws.

13.17. **Waiver of Jury Trial**. **BORROWER AND BANK AGREE THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY BANK OR BORROWER, ON OR WITH RESPECT TO THIS NOTE OR ANY OTHER LOAN DOCUMENT OR THE DEALINGS OF THE PARTIES WITH RESPECT HERETO OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. BANK AND BORROWER EACH HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND INTELLIGENTLY AND WITH THE ADVICE OF THEIR RESPECTIVE COUNSEL, WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. FURTHER, BORROWER WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER**

**ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS NOTE AND THAT BANK WOULD NOT EXTEND CREDIT TO BORROWER IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS NOTE.**

14. **LINE OF CREDIT PROVISIONS.**

14.1 **Line of Credit**. This Note evidences a revolving line of credit. Borrower may borrow, repay, and re-borrow sums under this Note, provided that the aggregate principal amount outstanding at any one time under this Note may not exceed Five Million and No/100 Dollars ($5,000,000.00) (the "**Loan Amount**"). Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Bank may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (a) advanced in accordance with the instructions of an authorized person; or (b) credited to any of Borrower's accounts with Bank. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Bank's internal records, including daily computer print-outs.

14.2 **Demand of Payment**. Bank may demand immediate payment of all amounts due under this Note without advance notice to Borrower at any time for any reason at Bank's sole discretion, even in the absence of a default under this Note.

14.3 **Bank's Option to Convert Line of Credit to Term Loan**. If Bank terminates this Loan, Bank may elect to convert this Loan to a term loan at any time for any reason at Bank's sole discretion. If Bank so elects to convert this Loan to a term loan, Borrower shall pay this loan in sixty (60) equal monthly payments of principal plus accrued interest in the amount calculated by Bank to fully amortize the then existing principal balance of the loan over the sixty (60) monthly payments, using an interest rate to be determined by Bank at time of conversion, and the interest calculation method described in the Interest sections above. Borrower shall make the monthly payments in the amounts and on the dates Bank shall set forth in a notice to Borrower, which notice shall be given to Borrower at least thirty (30) days prior to the date of the first monthly payment. Borrower's final payment shall be due on the date of the sixtieth (60th) monthly payment and shall be in the amount of all unpaid principal, unpaid accrued interest, and all other amounts due under this Note.

14.4 **Reduction of Credit Limit**. The "Credit Limit" for this Note is the original Loan Amount defined above. Bank may reduce the amount of this Credit Limit without advance notice during any period of time in which any of the following conditions are in effect.

14.4.1 Bank believes in the sole discretion that Borrower will be unable to fulfill Borrower's payment obligations under this Note due to a material change in Borrower's financial circumstances based upon information available to Bank;

14.4.2 Borrower is in default under any payment obligations of this Note; or

14.4.3 If Borrower requests a reduction of the amount of the Credit Limit and Bank agrees, no additional documentation will be required other than the proper documentation of the request for a reduction of the amount of the Credit Limit.

14.5 **Suspension of Credit**. In addition to any other rights, Bank can suspend additional extensions of credit or reduce Borrower's Credit Limit during any period in which any of the following are in effect:

14.5.1 The value of the collateral declines significantly below the collateral's appraised value for purposes of this Loan. This includes, for example, a decline such that the initial difference between the Loan Amount and the available equity is reduced by fifty percent (50%) and may include a smaller decline depending on the individual circumstances;

14.5.2 Bank reasonably believes that Borrower will be unable to fulfill Borrower's payment obligations under Borrower's Loan due to a material change in Borrower's financial circumstances;

14.5.3 Borrower is in default under any material obligations of this Loan. Bank considers all of Borrower's obligations to be material. Categories of material obligations include: obligations pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the Property, obligations to notify Bank and to provide documents or information to Bank (such as updated financial information), and obligations to comply with applicable laws (such as zoning restrictions). No default will occur until Bank mails or delivers a notice of default to Borrower, so Borrower can restore Borrower's right to credit advances;

14.5.4 Bank is precluded by government action from imposing the Applicable Interest Rate;

14.5.5 The priority of Bank's security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120) of the Loan Amount; or

14.5.6 Bank has been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

14.6 **Termination of Line**. Bank may terminate this Loan without advance notice, at any time for any reason at Bank's sole discretion, even in the absence of a default under this Note. If Bank terminates this Loan, it may also require Borrower to pay Bank the entire outstanding balance in one payment along with any accrued and unpaid interest. If Bank terminates this Loan, Bank is not required to give the Borrower notice of Bank's intention to do so.

[Signature appears on following page]

Borrower, intending to be legally bound, has duly executed and delivered this Note as of the day and year first above written.

**BORROWER:**

BENJI AUTO SALES CORP.,
a Florida corporation

By: ______________________________
Benji Urra, President

STATE OF FLORIDA )
SS.:
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 15 day of April, 2025, by Benji Urra as the President of Benji Auto Sales Corp., a Florida corporation, on behalf of the corporation. He is personally known to me (YES) (NO) or has produced Driver's License as identification.

______________________________
Notary Public

[Notarial Seal]

Wendy Arteaga
Printed Name of Notary

Notary Public State of Florida
Wendy Arteaga
My Commission HH 641517
Expires 2/17/2029

# Exhibit E

# GUARANTY AGREEMENT

**THIS GUARANTY** dated April 17, 2025 (together with any amendments or modifications hereto in effect from time to time, the **"Guaranty"**), made by **BENJI URRA** and **ANGELA ELENA URRA** (the **"Guarantor"**), each having an address at 14850 Millstone Ranches Dr., Davie, Florida 33331, in favor of **OCEAN BANK**, a Florida banking corporation, having an office at 780 N.W. 42nd Avenue, Suite 300, Miami, Florida 33126 (**"Bank"**).

To induce Bank to make loans, extensions of credit or other financial accommodations to BENJI AUTO SALES CORP., a Florida corporation ( **"Borrower"**), now or in the future under the Loan Documents (as defined below), to secure the observance, payment and performance of the Liabilities (as defined below), and with full knowledge that Bank would not make the said loans, extensions of credit or financial accommodations without this Guaranty, which shall be construed as a contract of suretyship, Guarantor unconditionally agrees as follows:

1. **LIABILITIES GUARANTEED**.

Guarantor hereby guarantees and becomes surety to Bank for the full, prompt and unconditional payment of the Liabilities (as defined below), when and as the same shall become due, whether at the stated maturity date, by acceleration or otherwise, and the full, prompt and unconditional performance of each term and condition to be performed by Borrower under the Loan Documents (as defined below). This Guaranty is a primary obligation of Guarantor and shall be a continuing inexhaustible Guaranty until payment in full and satisfaction of all Obligations and other amounts payable under this Guaranty. This is a guaranty of payment and not of collection. Bank may require Guarantor to pay and perform its liabilities and obligations under this Guaranty and may proceed immediately against Guarantor without being required to bring any proceeding or take any action against Borrower, any other guarantor or any other person, entity or property prior thereto, the liability of Guarantor hereunder being joint and several, and independent of and separate from the liability of Borrower, any other guarantor or person, and the availability of other collateral security for the Note, Loan Agreement and the other Loan Documents.

2. **DEFINITIONS**.

2.1. **"Note"** means that certain Demand Line of Credit Promissory Note of even date herewith from Borrower to Bank in the stated principal amount of $5,000,000.00.

2.2. **"Loan Agreement"** means that certain Loan and Security Agreement of even date herewith between Borrower and Bank.

2.3. **"Loan Documents"** shall have the meaning set forth in the Note. The terms of the Loan Documents are hereby made a part of this Guaranty to the same extent and with the same effect as if fully set forth herein.

2.4. **"Liabilities"** means, collectively: (i) the repayment of all sums due under the Note and Loan Agreement (and all extensions, renewals, replacements and amendments thereof) and the other Loan Documents; and (ii) the performance of all terms, conditions and covenants set forth in the Loan Documents.

2.5. All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Loan Documents.

3. **REPRESENTATION AND WARRANTIES**. Guarantor represents and warrants to Bank as follows:

3.1. **Capacity**. Each Guarantor is an adult individual and is sui juris.

3.2. **Execution of Guaranty**. This Guaranty and each other Loan Document to which Guarantor is a party have been duly executed and delivered by Guarantor. Execution, delivery and performance of this Guaranty and each other Loan Document to which Guarantor is a party will not: (i) violate any provision of law, order of any court, agency or instrumentality of government, or any provision of any indenture, agreement or other instrument to which it is a party or by which it or any of its properties is bound; (ii) result in the creation or imposition of any lien, charge or encumbrance of any nature, other than the liens created by the Loan Documents; and (iii) require any authorization, consent, approval, license, exemption of, or filing or registration with, any court or governmental authority.

3.3. **Obligations of Guarantor**. This Guaranty and each other Loan Document to which Guarantor is a party are the legal, valid and binding obligations of Guarantor, enforceable against it in accordance with their terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws or equitable principles relating to or affecting the enforcement of creditors' rights generally. The loans or credit accommodations made by Bank to Borrower and the assumption by Guarantor of its obligations hereunder and under any other Loan Document to which Guarantor is a party will result in material benefits to Guarantor. This Guaranty was entered into by Guarantor for commercial purposes.

3.4. **Litigation**. There is no action, suit, or proceeding at law or in equity or by or before any governmental authority, agency or other instrumentality now pending or, to the actual knowledge of Guarantor, threatened against or affecting Guarantor or any of its properties or rights which, if adversely determined, would materially impair or affect: (i) the value of any collateral securing the Liabilities; (ii) Guarantor's right to carry on its business substantially as now conducted (and as now contemplated); (iii) his/her financial condition; or (iv) his/her capacity to consummate and perform its obligations under this Guaranty or any other Loan Document to which Guarantor is a party.

3.5. **No Defaults**. To Guarantor's actual knowledge, Guarantor is not in default beyond any applicable cure, grace or notice period in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained herein or in any material agreement or instrument to which it is a party or by which it or any of its properties is bound.

3.6. **No Untrue Statements**. No Loan Document or other document, certificate or statement furnished to Bank by or on behalf of Guarantor contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein not misleading. Guarantor acknowledges that all such statements, representations and warranties shall be deemed to have been relied upon by Bank as an inducement to make the Loan to Borrower.

4. **NO LIMITATION OF LIABILITY**.

4.1. Without incurring responsibility to Guarantor, and without impairing or releasing the obligations of Guarantor to Bank, and without reducing the amount due under the terms of this Guaranty and except as expressly required in the Loan Documents, Bank may at any time and from time to time, without the consent of or notice to Guarantor, upon any terms or conditions, and in whole or in part:

4.1.1. Change the manner, place or terms of payment of (including, without limitation, the interest rate and monthly payment amount), and/or change or extend the time for payment of, or renew or modify, any of the Liabilities, any security therefor, or any of the Loan Documents evidencing same, and the Guaranty herein made shall apply to the Liabilities and the Loan Documents as so changed, extended, renewed or modified;

4.1.2. Sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order, any property securing the Liabilities;

4.1.3. Exercise or refrain from exercising any rights against Borrower or other obligated parties (including Guarantor) or against any security for the Liabilities;

4.1.4. During the continuance of an Event of Default beyond applicable notice, cure and grace periods, settle or compromise any Liabilities, whether in a proceeding or not, and whether voluntarily or involuntarily, dispose of any security therefor (with or without consideration), and subordinate the payment of any of the Liabilities, whether or not due, to the payment of liabilities owing to creditors of Borrower other than Bank and Guarantor;

4.1.5. Apply any sums it receives, by whomever paid or however realized, to any of the Liabilities;

4.1.6. Add, release, settle, modify or discharge the obligation of any maker, endorser, guarantor, surety, obligor or any other party who is in any way obligated for any of the Liabilities;

4.1.7. Accept any additional security for the Liabilities; and/or

4.1.8. Take any other action which might constitute a legal or equitable discharge of the Guaranty prior to termination of the Guaranty.

4.2. The invalidity, irregularity or unenforceability of all or any part of the Liabilities or any Loan Document, or the impairment or loss of any security therefor, whether caused by any action or inaction of Bank, or otherwise, shall not affect, impair or be a defense to Guarantor's obligations under this Guaranty.

5. **LIMITATION ON SUBROGATION.** Until such time as the Liabilities are paid in full, expire or are terminated and the Loan Documents are no longer in effect, Guarantor waives any present or future right to which Guarantor is or may become entitled to be subrogated to Bank's rights against Borrower or to seek contribution, reimbursement, indemnification, payment or the like, or participation in any claim, right or remedy of Bank against Borrower or any security which Bank now has or hereafter acquires, whether or not such claim, right or remedy arises under contract, in equity, by statute, under common law or otherwise. If, notwithstanding such waiver, any funds or property shall be paid or transferred to Guarantor on account of such subrogation, contribution, reimbursement, or indemnification at any time when all of the Liabilities have not been paid in full, expire or are terminated and the Loan Documents are no longer in effect, Guarantor shall hold such funds or property in trust for Bank and shall forthwith pay over to Bank such funds and/or property to be applied by Bank to the Liabilities.

6. **COVENANTS**.

6.1. **Financial Statements; Compliance Certificate**.

6.1.1. Guarantor shall furnish to Bank the following financial information, in each instance prepared in accordance with generally accepted accounting principles consistently applied:

(a) Not later than twelve (12) months from the date of the last furnished personal financial statements, annual personal financial statements of Guarantor including, without limitation, statements of financial condition, a listing of real estate holdings (including percentage of ownership and ownership status), income and cash flows, a reconciliation of net worth, a listing of all contingent liabilities, notes to financial statements, and any other information requested by Bank, certified as to correctness by the Guarantor and otherwise in form and substance satisfactory to Bank.

(b) As soon as available and in no event later than thirty (30) days after filing with the Internal Revenue Service, a true and complete copy of the federal tax returns, including all schedules, of Guarantor, and any request for an extension of the filing date thereof. Notwithstanding any extension timely filed, Guarantor shall provide his tax returns by no later than November 15th of each year.

(c) Such other information respecting the operations of Guarantor as Bank may from time to time reasonably request.

6.1.2. Guarantor shall furnish to Bank, with each set of financial statements described herein, a compliance certificate signed by Guarantor certifying that: (i) all representations and warranties of Guarantor set forth in this Guaranty or any other Loan Document

remain true and correct; (ii) none of the covenants of Guarantor contained in this Guaranty or any other Loan Document has been breached; and (iii) to its knowledge, no event has occurred which, with the giving of notice or the passage of time, or both, would constitute an Event of Default under this Guaranty or any other Loan Document. In addition, Guarantor shall promptly notify Bank of the occurrence of any default, Event of Default, adverse litigation or material adverse change in its financial condition.

6.2. **Subordination of Other Debts**. Each Guarantor agrees: (a) to subordinate the obligations now or hereafter owed by Borrower to Guarantor (**"Subordinated Debt"**) in accordance with the Subordination Agreement in favor of Bank of even date herewith.

6.3. **Security for Guaranty**. Guarantor hereby grants to Bank a continuing security interest in all property of Guarantor, now or hereafter in the possession of Bank, as security for the performance of this Guaranty, which security interest shall be enforceable and subject to all the provisions of this Guaranty, as if such property were specifically pledged hereunder.

7. **EVENTS OF DEFAULT**.

Each of the following shall constitute a default (each, an **"Event of Default"**) hereunder:

7.1. Non-payment when due of any sum required to be paid to Bank under any of the Loan Documents or of any of the other Liabilities;

7.2. A breach by Guarantor of any other term, covenant, condition, obligation or agreement under this Guaranty, and the continuance of such breach for a period of fifteen (15) days after written notice thereof shall have been given to Guarantor;

7.3. Any representation or warranty made by Guarantor in this Guaranty shall prove to be false, incorrect or misleading in any material respect as of the date when made;

7.4. The death of any Guarantor; or

7.5. An Event of Default under any of the Loan Documents beyond any applicable cure, grace or notice period.

8. **REMEDIES**.

8.1. Upon an Event of Default beyond any applicable cure, grace or notice period, all liabilities of Guarantor hereunder shall become immediately due and payable without demand or notice and, in addition to any other remedies provided by law, Bank may:

8.1.1. Enforce the obligations of Guarantor under this Guaranty.

8.1.2. To the extent not prohibited by and in addition to any other remedy provided by law, setoff against any of the Liabilities any sum owed by Bank in any capacity to Guarantor whether due or not.

8.1.3. Perform any covenant or agreement of Guarantor in default hereunder (but without obligation to do so) and in that regard pay such money as may be required or as Bank may reasonably deem expedient. Any costs, expenses or fees, including reasonable thir party attorneys' fees and costs, incurred by Bank in connection with the foregoing shall be included in the Liabilities guaranteed hereby, and shall be due and payable on demand, together with interest at the Default Rate (as defined and described in the Note), such interest to be calculated from the date of such advance to the date of repayment thereof. Any such action by Bank shall not be deemed to be a waiver or release of Guarantor hereunder and shall be without prejudice to any other right or remedy of Bank.

8.2. Settlement of any claim by Bank against Borrower, whether in any proceeding or not, and whether voluntary or involuntary, shall not reduce the amount due under the terms of this Guaranty, except to the extent of the amount actually paid and legally retained by Bank in connection with the settlement (unless otherwise provided for herein).

9. **MISCELLANEOUS**.

9.1. **Disclosure of Financial Information**. Bank is hereby authorized to disclose any financial or other information about Guarantor to any regulatory body or agency having jurisdiction over Bank or to any present, future or prospective participant or successor in interest in any loan or other financial accommodation made by Bank to Borrower or Guarantor. The information provided may include, without limitation, amounts, terms, balances, payment history, return item history and any financial or other information about Guarantor.

9.2. **Remedies Cumulative**. The rights and remedies of Bank, as provided herein and in any other Loan Document, shall be cumulative and concurrent, may be pursued separately, successively or together, may be exercised as often as occasion therefor shall arise, and shall be in addition to any other rights or remedies conferred upon Bank at law or in equity. The failure, at any one or more times, of Bank to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. Bank shall have the right to take any action it deems appropriate without the necessity of resorting to any collateral securing this Guaranty.

9.3. **Integration**. This Guaranty and the other Loan Documents constitute the sole agreement of the parties with respect to the transaction contemplated hereby and supersede all oral negotiations and prior writings with respect thereto.

9.4. **Attorneys' Fees and Expenses**. If Bank retains the services of counsel by reason of a claim of a default or an Event of Default hereunder or under any of the other Loan Documents, or on account of any matter involving this Guaranty, or for examination of matters subject to Bank's approval under the Loan Documents, all costs of suit and all reasonable third party attorneys' fees and such other reasonable expenses so incurred by Bank shall forthwith, on demand, become due and payable and shall be secured hereby.

9.5. **No Implied Waiver**. Bank shall not be deemed to have modified or waived any of its rights or remedies hereunder unless such modification or waiver is in writing and signed by

Bank, and then only to the extent specifically set forth therein. A waiver in one event shall not be construed as continuing or as a waiver of or bar to such right or remedy on a subsequent event.

9.6. **Waiver**. Guarantor waives notice of acceptance of this Guaranty and notice of the Liabilities and waives notice of default, non-payment, partial payment, presentment, demand, protest, notice of protest or dishonor, and all other notices to which Guarantor might otherwise be entitled or which might be required by law to be given by Bank. Guarantor waives the right to marshalling of Borrower's assets or any stay of execution and the benefit of all exemption laws, to the extent permitted by law, and any other protection granted by law to guarantors, now or hereafter in effect with respect to any action or proceeding brought by Bank against it. Guarantor irrevocably waives all claims of waiver, release, surrender, alteration or compromise and the right to assert against Bank any defenses, set-offs, counterclaims, or claims that Guarantor may have at any time against Borrower or any other party liable to Bank.

9.7. **No Third Party Beneficiary**. Except as otherwise provided herein, Guarantor and Bank do not intend the benefits of this Guaranty to inure to any third party and no third party (including Borrower) shall have any status, right or entitlement under this Guaranty.

9.8. **Partial Invalidity**. The invalidity or unenforceability of any one or more provisions of this Guaranty shall not render any other provision invalid or unenforceable. In lieu of any invalid or unenforceable provision, there shall be added automatically a valid and enforceable provision as similar in terms to such invalid or unenforceable provision as may be possible.

9.9. **Binding Effect**. The covenants, conditions, waivers, releases and agreements contained in this Guaranty shall bind, and the benefits thereof shall inure to, the parties hereto and their respective heirs, executors, administrators, successors and assigns; provided, however, that this Guaranty cannot be assigned by Guarantor other than to any replacement guarantor permitted pursuant to the terms of this Guaranty without the prior written consent of Bank, and any such assignment or attempted assignment by Guarantor shall be void and of no effect with respect to the Bank.

9.10. **Modifications**. This Guaranty may not be supplemented, extended, modified or terminated except by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

9.11. **Sales or Participations**. Bank may from time to time sell or assign, in whole or in part, or grant participations in the Loan, the Note and/or the obligations evidenced thereby. The holder of any such sale, assignment or participation, if the applicable agreement between Bank and such holder so provides, shall be: (a) entitled to all of the rights, obligations and benefits of Bank; and (b) deemed to hold and may exercise the rights of setoff or banker's lien with respect to any and all obligations of such holder to Guarantor, in each case as fully as though Guarantor were directly indebted to such holder. Bank may in its discretion give notice to Guarantor of such sale, assignment or participation; however, the failure to give such notice shall not affect any of Bank's or such holder's rights hereunder.

9.12. **Jurisdiction**. Guarantor hereby consents that any action or proceeding against it be commenced and maintained in any court within Miami-Dade County in the State of Florida by lawful service of process; and Guarantor agrees that the courts of such State shall have jurisdiction with respect to the subject matter hereof and the person of Guarantor and all collateral securing the obligations of Guarantor. Guarantor agrees not to assert any defense to any action or proceeding initiated by Bank based upon improper venue or inconvenient forum.

9.13. **Notices**. All notices and communications under this Guaranty shall be in writing and shall be given by either (a) hand-delivery, (b) first class mail (postage prepaid) certified, with return receipt requested, or (c) reliable overnight commercial courier (charges prepaid), to the addresses listed in this Guaranty. Notice shall be deemed to have been given and received: (i) if by hand delivery, upon delivery; (ii) if by mail, three (3) calendar days after the date first deposited in the United States mail; and (iii) if by overnight courier, on the date scheduled for delivery. A party may change its address by giving written notice to the other party as specified herein.

9.14. **Governing Law**. This Guaranty shall be governed by and construed in accordance with the substantive laws of the State of Florida without reference to conflict of laws principles.

9.15. **Joint and Several Liability**. If Guarantor consists of more than one person or entity, the word **"Guarantor"** shall mean each of them and their liability shall be joint and several. The liability of Guarantor shall also be joint and several with the liability of any other guarantor under any other guaranty.

9.16. **Continuing Enforcement**. If, after receipt of any payment of all or any part of the Liabilities, Bank is compelled or agrees, for settlement purposes, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Guaranty shall continue in full force and effect or be reinstated, as the case may be, and Guarantor shall be liable for, and shall indemnify, defend and hold harmless Bank with respect to the full amount so surrendered. The provisions of this Section shall survive the termination of this Guaranty and shall remain effective notwithstanding the payment of the Liabilities, the cancellation of the Note, this Guaranty or any other Loan Document, the release of any security interest, lien or encumbrance securing the Liabilities or any other action which Bank may have taken in reliance upon its receipt of such payment. Any cancellation, release or other such action shall be deemed to have been conditioned upon any payment of the Liabilities having become final and irrevocable.

9.17. **Waiver of Jury Trial**. **GUARANTOR AND BANK AGREE THAT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY SUIT, ACTION OR PROCEEDING, WHETHER CLAIM OR COUNTERCLAIM, BROUGHT BY BANK OR GUARANTOR ON OR WITH RESPECT TO THIS GUARANTY OR ANY OTHER LOAN DOCUMENT OR THE DEALINGS OF THE PARTIES WITH RESPECT HERETO OR THERETO, SHALL BE TRIED ONLY BY A COURT AND NOT BY A JURY. BANK AND GUARANTOR EACH HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND INTELLIGENTLY, AND WITH THE ADVICE OF THEIR**

**RESPECTIVE COUNSEL, WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. FURTHER, GUARANTOR WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER, IN ANY SUCH SUIT, ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE, CONSEQUENTIAL OR OTHER DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. GUARANTOR ACKNOWLEDGES AND AGREES THAT THIS SECTION IS A SPECIFIC AND MATERIAL ASPECT OF THIS GUARANTY AND THAT BANK WOULD NOT EXTEND CREDIT TO BORROWER IF THE WAIVERS SET FORTH IN THIS SECTION WERE NOT A PART OF THIS GUARANTY.**

[Signature appears on following page]

**IN WITNESS WHEREOF**, Guarantor, intending to be legally bound, has duly executed and delivered this Guaranty as of the day and year first above written.

**GUARANTOR**

BENJI URRA

ANGELA ELENA URRA

STATE OF FLORIDA )
) ss:
COUNTY OF Broward )

The foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 15 day of April, 2025, by Benji Urra, who is personally known to me or who has produced Drivers License as identification.

[NOTARIAL SEAL]

Notary Public State of Florida
Wendy Arteaga
My Commission HH 641517
Expires 2/17/2029

Print Name: Wendy Arteaga
Notary Public, State of Florida
Commission #: HH 641517
My Commission Expires: 2/17/29

STATE OF FLORIDA )
) ss:
COUNTY OF Broward )

The foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 15 day of April, 2025, by Angela Elena Urra, who is personally known to me or who has produced Drivers License as identification.

[NOTARIAL SEAL]

Wendy Arteaga
Print Name:
Notary Public, State of Florida
Commission #: HH641517
My Commission Expires: 2/17/29

#518754872_v1

Notary Public State of Florida
Wendy Arteaga
My Commission HH 641517
Expires 2/17/2029

# Exhibit F

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS that the undersigned, **BEJI AUTO SALES CORP.**, a Florida corporation, hereby confirms, that as of the date hereof, it hereby names and appoints, **OCEAN BANK**, to be our lawful attorney-in-fact, to act for us, in applying for an original or duplicate certificate of title, to register, transfer title, or record a lien with respect to any motor vehicle owned by the undersigned, and to print our name and sign their name, in our behalf. The attorney-in-fact can also do all things necessary to the application or any other related instrument and to bind us in as sufficient a manner as we ourselves could do, were we personally present and signing the same.

With full power of substitution and revocation, we hereby ratify and confirm whatever our said attorney-in-fact may lawfully do or cause to be done in the virtue hereof.

The undersigned, does hereby ratify and confirm all that said Attorney shall lawfully do or cause to be done by virtue hereof; including any and all actions heretofore taken on its behalf, and the undersigned does hereby waive any and all notice of any such actions or transactions and furthermore agrees and covenants with any and all individuals, partnerships, companies or entities whatever that the undersigned will be bound by actions or transactions entered into in reliance hereon.

IN WITNESS WHEREOF, we hereunto set our hands and seals as of the 17th day of April, 2025.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

**Signed, sealed and delivered in the presence of:**

Name: Raybel lopez

Name: Bianca Fernandez

**BENJI AUTO SALES CORP.,**
a Florida corporation

By: ______________________

Name: Benji Urra

Title: President

STATE OF FLORIDA )
SS.:
COUNTY OF MIAMI-DADE )

The foregoing instrument was acknowledged before me by means of ☑ physical presence or ☐ online notarization, this 15 day of April, 2025, by Benji Urra as the President of Benji Auto Sales Corp., a Florida corporation, on behalf of the corporation. She is personally known to me (YES) (NO) or has produced Driver's license as identification.

______________________
Notary Public

[Notarial Seal]

Notary Public State of Florida
Wendy Arteaga
My Commission HH 641517
Expires 2/17/2029

Wendy Arteaga
Printed Name of Notary

# Exhibit G

OCEAN BANK

**Brian Recor, Esq.**
780 NW 42nd Avenue, Suite 400
Miami, Florida 33126-5540
Phone: (305) 569-8461
Email: brecor@oceanbank.com

September 11, 2025

**VIA EMAIL (benji@benjiautosales.com)**
**& CERTIFIED MAIL WITH RETURN RECEIPT REQUESTED**

Benji Auto Sales Corp.
3805 S. State Road 7
West Park, Florida 33023

Benji Auto Sales Corp.
1041 E 49 Street
Hialeah, Florida 33013

Benji Urra
Angela Elena Urra
14850 Millstone Ranches Dr.
Davie, Florida 33331

**Re: <u>Loan No. 252504694263 i/n/o Benji Auto Sales Corp. ("Borrower") ("Loan")</u>**
**(OB No. 25-0861) Notice of Breach of Loan Agreement**

Demand Line of Credit Promissory Note, dated April 17, 2025, i/a/o $5,000,000.00 ("Note")
Loan and Security Agreement (Floor Plan Loan), dated April 17, 2025, i/n/o Benji Auto Sales Corp.("Loan Agreement")
Second Mortgage and Security Agreement, dated April 17, 2025 i/n/o Benji Urra and Angela Elena Urra ("Mortgage")
Guaranty Agreement, dated April 17, 2025 i/n/o Benji Urra and Angela Elena Urra ("Guaranty")
Post-Closing Agreement, dated April 17, 2025 ("Post-Closing Agreement")
[collectively, "Loan Documents"]

Dear Borrower:

This letter provides written notice of Borrower's breaches of the Loan Documents. If Ocean Bank is not satisfied with the resolution of these breaches **<u>within 30 days of receipt of this letter</u>**, this constitutes an Event of Default. The breaches include:

1. Moving Collateral & Changing Location Without Notification or Written Consent
2. Failure to Pay All Taxes and Levies
3. Failure to Provide Notice of Threatened or Actual Actions
4. Failure to Provide Evidence of UCC-1 Terminations
5. Failure to Disclose Mortgage on Guarantors' Personal Financial Statement

Under Section 18 of the Loan Agreement, Borrower agreed "not to remove or permit the removal of any Financed Inventory from the Dealer Location without the prior written consent of the Bank or transfer, dispose of, or illegally or improperly use said Financed Inventory." Under Section 11(a), Borrower also must immediately notify Bank in writing of any change in the location of the places of business where the bulk of Borrower's Financed Inventory is located or any change in the location of the place of business where the records concerning Borrower's Accounts are kept." Further, under Section 12(h), "Borrower shall not be permitted to change the Dealer Location without the prior written consent of Bank."

Ocean Bank recently learned that Borrower moved the collateral (Financed Inventory), and likely records, to Broward County and closed the Orlando location without informing or obtaining the prior written consent of Ocean Bank.

Under Section 11(i), Borrower must also "not default under or breach any of the terms, conditions or requirements of any lease under which Borrower is a tenant." Ocean Bank understands that approximately 16 months remain on Borrower's September 2021 lease in Orlando, but that Borrower has no intention of operating its business further at the Orlando location. You have stated that Harrow of Longwood Ltd., the landlord for Borrower's Orlando location, has consented to an early termination of the lease. However, Borrower has not provided proof of this agreement.

Also under Section 11, Borrower must "(e) pay and discharge when due all taxes, levies and other charges on its Financed Inventory…[and] (g) give Bank immediate written notice of (A) any adverse change in Borrower's financial condition, and (B) all threatened or actual actions, investigations or proceedings affecting Borrower…[and] (k) provide such other information as Bank may from time to time reasonably request."

Ocean Bank is now aware of unpaid State of Florida tax lien for delinquent sales and use tax ($16,539.54). There also appears to be at least one pending civil case by Truist Bank against Borrower and potential issues with the Florida Department of Highway Safety and Motor Vehicles. However, Borrower has not paid the tax lien, advised of any threatened or actual actions or given notice of any adverse change in Borrower's financial condition.

Under the Post-Closing Agreement, Borrower was required to provide evidence that six (6) UCC-1's (listed in Exhibit A to the Post-Closing Agreement) have been terminated; failure to do so within the specified time period is an Event of Default. While the time period has expired, Borrower still has failed to provide evidence of termination.

Under Section 6.1 of the Guaranty, Guarantors agreed to certify and furnish certain financial information to Ocean Bank. False, incorrect or misleading information constitutes an Event of Default under Section 7.3.

Ocean Bank recently learned that there is a $3,000,000.00 mortgage encumbering Guarantors' real property located at 1031/1041 E 49th Street, Hialeah, Florida. While this mortgage is dated December 2024 (after the May 31, 2024 Personal Financial Statement stating there was no

mortgage on this same property), Guarantors later certified on January 6, 2025 that they were not co-makers or guarantors on any loan or contract, and that the prior Personal Financial Statement was still true and correct. It appears that Guarantors failed to disclose a material change in the financial information regarding their financial position.

**Within thirty (30) days, Ocean Bank requests that Borrower provide the following items in writing:**

1. Current location of all collateral under the Loan Agreement,

2. Landlord's agreement to early termination of the Orlando lease without penalty,

3. Evidence of full satisfaction of any outstanding tax liens,

4. Disclosure of any IRS audits or pending audits or known investigations pertaining to EV Tax Credits,

5. Proof of Borrower's current eligibility status as a registered dealer for IRS ECO (Energy Credit Online) and verification that this eligibility has not been revoked,.

6. Explanation and current status of all threatened or actual actions, investigations or proceedings affecting Borrower, including those by Truist Bank and Florida Department of Highway Safety and Motor Vehicles,

7. Evidence of termination of all six (6) UCC-1's listed in Exhibit A to the Post-Closing Agreement,

8. Updated/corrected Personal Financial Statement for Guarantors.

Nothing contained in this letter, or in any previous Ocean Bank communications regarding this Loan, shall operate or be deemed to operate to waive or modify any provision of the Loan Documents, or to waive any right or remedy of Ocean Bank. No acceptance by Ocean Bank of any partial payments shall constitute a waiver or modification of any default or constitute a waiver or postponement of any right or remedy of Ocean Bank. No present or future communications or negotiations by Ocean Bank, including any of its representatives, shall be binding on Ocean Bank, unless and until such communications and negotiations are included in a written agreement which is signed by an officer of Ocean Bank and by Borrower.

Best regards,

/s/ Brian Recor, Esq.
Ocean Bank Legal Department

# Exhibit H

**WEISSMAN & DERVISHI PA**
ATTORNEYS AT LAW

**ONE SE THIRD AVENUE, SUITE 1700**
**MIAMI, FLORIDA 33131**
**TEL (305) 347-4070**

September 15, 2025

*Via Hand Delivery and*
*Federal Express Overnight Delivery*

Benji Auto Sales Corp.
c/o Benji Urra, President
3805 S. State Road 7
West Park, FL 33023

Benji Auto Sales Corp.
c/o Benji Urra, President
1041 E. 49th St.
Hialeah, FL 33013

Benji Urra
14850 Millstone Ranches Dr.
Davie, FL 33331

Angela Elena Urra
14850 Millstone Ranches Dr.
Davie, FL 33331

Re: **NOTICE OF DEFAULT AND DEMAND FOR PAYMENT**

Dear Mr. and Mrs. Urra:

This firm represents Ocean Bank in connection with its $5,000,000.00 line of credit loan to Benji Auto Sales Corp. ("Borrower"), dated April 17, 2025 (the "Loan"), guaranteed by Benji Urra and Angela Elena Urra (together, "Guarantor"). This is a notice of default and demand for payment. This amends and supersedes Ocean Bank's prior notice dated September 11, 2025.

Ocean Bank notified you in the prior notice of at least five breaches under the Loan and Security Agreement dated April 17, 2025 (the "Credit Agreement"), the Demand Line of Credit Promissory Note dated April 17, 2025 (the "Note"), and the other documents executed in connection with the Loan (collectively, the "Loan Documents"). Ocean Bank is no longer willing to afford Borrower time to correct the breaches. The breaches constitute an Event of Default under the Credit Agreement, the Note, and the other Loan Documents.

Due to the occurrence of the Event of Default, Ocean Bank elects to accelerate the indebtedness of the Note. The Note is payable in full immediately upon demand, without advance notice, at any time, for any reason, in Ocean Bank's sole discretion, even in the absence of an Event of Default.

Ocean Bank declares the entire unpaid principal balance of the Loan and all accrued unpaid interest immediately due and payable by Borrower and Guarantor. Ocean Bank demands that Borrower and Guarantor immediately pay the following total amount due on the Loan:

| | |
|---|---|
| Principal balance | $4,708,141.57 |
| Accrued interest | $32,873.37 |
| Total amount due as of September 15, 2025 plus all interest that continues to accrue, attorneys' fees, costs, and all other permitted charges and expenses, including, but not limited to, security costs, audit costs, and valuation costs | $4,741,014.94 |

You must immediately deliver full payment as demanded in this notice. The principal balance is subject to adjustment based on transactions in process, Ocean Bank reserves the right to add interest at the default rate pursuant to Section 8 of the Note from and after the occurrence of the Event of Default, and Ocean Bank further reserves the right to amend this notice and the calculation of the total amount due set forth above if the notice contains any errors or omissions. Accordingly, please contact us for updated payoff figures and wiring instructions prior to remitting payment. If you make the payment by check, please make it payable to "Ocean Bank" and deliver it to our office. We hope to receive prompt payment so that no further action is necessary.

Your failure to deliver full payment as demanded in this notice shall result in full pursuit by Ocean Bank of all amounts due without further notice, whether by the institution of a lawsuit or otherwise. Ocean Bank's rights and remedies under Section 21 of the Credit Agreement include, among other things:

(i) Ocean Bank shall have and may exercise immediately and without demand, any and all the rights and remedies granted to a secured party upon default under the Uniform Commercial Code or any other remedy available under law (including, without limitation, repossession of any collateral with or without resort to judicial proceedings and without any requirement to give Borrower any prior notice of such actions);

(ii) Upon the request or demand of Ocean Bank, Borrower shall, at

Borrower's expense, immediately assemble the Collateral (as defined in the Credit Agreement) and make it available to Ocean Bank in order to allow it to take possession at a convenient place acceptable to Ocean Bank;

(iii) Borrower shall immediately execute and deliver to Ocean Bank any and all instruments, documents, certificates of title, or any similar items which Ocean Bank, in its sole discretion, deems necessary to dispose of the Financed Inventory (as defined in the Credit Agreement) and Borrower appoints Ocean Bank its attorney in fact to execute, sign, and seal any and all instruments, documents, certificates of title, or any similar items which Ocean Bank, in its sole discretion, deems necessary to dispose of the Collateral; and

(iv) Borrower shall pay to Ocean Bank on demand any and all costs and expenses, including legal expenses and reasonable attorneys' fees, including costs, expenses, and reasonable attorneys incurred or paid by Ocean Bank in protecting and enforcing the Note and the right of Ocean Bank under the Credit Agreement, including Ocean Bank's right to take possession of the Collateral and to hold, prepare for sale, sell, and dispose of the Collateral, whether or not a lawsuit is instituted.

**We demand that you immediately assemble the vehicles and make them available to Ocean Bank in order to allow it to take possession at a convenient place acceptable to Ocean Bank.**

The Loan is additionally secured by that certain Second Mortgage and Security Agreement, dated April 17, 2025, recorded in Monroe County Official Records Book 3321, at Page 2124, encumbering the real property located at 111 Azalea St., Plantation Key, FL 33070. Your failure to deliver full payment as demanded in this notice may result in the institution of a judicial foreclosure action and a sale of the mortgaged real property without further notice.

Ocean Bank reserves the right, in its sole and absolute discretion, to enforce all of its rights and remedies, whether at law or in equity, to the fullest extent allowable, including, but not limited to, to enforce additional remedies and declare additional defaults that may not be included in this notice. Please be advised that Ocean Bank is entitled under the Loan Documents to recover all its attorneys' fees, court costs, and other costs and expenses.

At no time shall any prior or subsequent course of conduct by any of the parties directly or indirectly limit, impair, or otherwise adversely affect any of Ocean Bank's rights, interests, or remedies in connection with the Loan Documents or obligate Ocean Bank to agree to, or to negotiate or consider an

agreement to, any waiver of any obligation, liability, or event of default, or any amendment to any term or condition of the Loan Documents.

No present or future communications or negotiations between the parties concerning the Loan Documents or any related matters shall be binding, unless and until such communications or negotiations are included in a written agreement that is fully executed by an authorized officer of Ocean Bank, Borrower, and Guarantor.

Ocean Bank demands that you preserve all documents, records, emails, accounting files, computer files, and electronically stored information pertaining in any way to the matters that are the subject of this notice. You are cautioned against discarding, destroying, or deleting any such documents or electronically stored information. This includes all information available on storage media and devices, including cell phones and laptops, and including emails and text messages.

Please govern your actions accordingly.

Very truly yours,

**/s/ Peter A. Tappert**

Peter A. Tappert
ptappert@wdpalaw.com

# Exhibit I

## INTERCREDITOR AND SUBORDINATION AGREEMENT

This Intercreditor and Subordination Agreement (this "Agreement") is made and entered as of April 17, 2025 (the "Effective Date") between Quick Shift Capital, LLC, a Florida Limited Liability Company ("Existing Lender"), Ocean Bank, a Florida banking corporation ("New Lender"), (collectively the "Lenders" and each individually a "Lender"), and Benji Auto Sales Corp., a Florida corporation ("Borrower").

### RECITALS:

WHEREAS, Existing Lender has extended a line of credit to Borrower in the maximum principal amount of $5,000,000.00 (the "Existing Loan"), which has a current outstanding principal balance of approximately $4,558,500.00 as of the date hereof (the "Current Outstanding Balance"), pursuant to that Loan and Security Agreement dated as of August 24, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "Existing Loan Agreement");

WHEREAS, to secure the obligations under the Existing Loan Agreement, Borrower has granted Existing Lender a Security Interest in substantially all of Borrower's assets, as evidenced by a UCC-1 Financing Statement filed with the Florida Secured Transaction Registry on August 29, 2024 as Filing No. 202402304276 (the "Existing UCC-1);

WHEREAS, New Lender has agreed to extend credit a line of credit to Borrower in the maximum principal amount of $5,000,000.00 (the "New Loan") pursuant to that certain Loan and Security Agreement dated as of April 17, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "New Loan Agreement");

WHEREAS, to secure the obligations under the New Loan Agreement, Borrower has agreed to grant New Lender a Security Interest in substantially all of Borrower's assets;

WHEREAS, the parties desire to establish their respective rights and priorities with respect to the Collateral securing the obligations under the Existing Loan Agreement and the New Loan Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained the parties hereto agree as follows:

1. DEFINITIONS.

As used herein, the following terms shall have the following meanings:

a. "Existing Lender Financed Inventory" means all Inventory of Borrower that has been and is hereafter Specifically Financed by Existing Lender under the Existing Loan Agreement, as identified in the records maintained by Existing Lender, together with all Proceeds which shall include all motor vehicles that any Buyer of the Existing Lender Financed Inventory provides to Borrower as a trade-in vehicle towards the purchase and sale of Inventory that qualifies as Existing Lender Priority Collateral.

b. "Existing Lender Priority Collateral" means all Existing Lender Financed Inventory existing prior to and after the Effective Date of this Agreement.

c. "Inventory" shall mean motor vehicles, trailers, parts and accessories therefore, and various other types of personal property purchased or otherwise acquired by Borrower for resale or lease to third persons.

d. "New Lender Financed Inventory" means all Inventory of Borrower that has been Specifically Financed by New Lender under the New Loan Agreement, as identified in the records maintained by New Lender, together with all Proceeds thereof.

e. "New Lender Priority Collateral" means the New Lender Finance Inventory and all of Borrower's now owned or hereafter acquired assets and property, including, without limitation, all Inventory, Equipment, Accounts, General Intangibles, Deposit Accounts, Investment Property, Instruments, Documents, Chattel Paper, Supporting Obligations, Letter-of-Credit Rights, Commercial Tort Claims, and all Proceeds and products of the foregoing, but excluding any one or more of the above to the extent that any such item is a part of the Existing Lender Priority Collateral.

f. "Proceeds" shall have the meaning given to such term under the UCC which shall include all Proceeds of or relating to Inventory, including amounts due from the retail buyers thereof, chattel paper, insurance Proceeds, and all Proceeds in whatever form, relating to the disposition of Inventory and all credits, accounts, and general intangibles due or to become due to Borrower from the manufacturer(s) of such Inventory.

g. "Specifically Financed" shall mean the financing of a particular motor vehicle unit of Inventory by either Lender when (i) such Lender gives new value to Borrower incurred as all or part of the price of the Inventory or (ii) for value given to enable the Borrower to acquire rights or the use of the motor vehicle unit if the value is in fact so used.

h. "Subordinated Collateral" means all Collateral in which Existing Lender has a Security Interest, other than the Existing Lender Priority Collateral.

2. SUBORDINATION AND PRIORITIES.

a. **Subordination by Existing Lender and Recognition of Existing Lender's Priority Collateral.**

i. Existing Lender hereby subordinates its Security Interest in the Subordinated Collateral to the Security Interest of New Lender therein. Existing Lender acknowledges that New Lender shall have a senior-priority Security Interest in the New Lender Priority Collateral regardless of the time of attachment or perfection of such Security Interest, including, without limitation, the filing the Existing UCC-1 Financing Statement. New Lender acknowledges that Existing Lender shall have a senior-priority Security Interest in the Existing Lender Priority Collateral regardless of the time of attachment or perfection of such Security Interest, including, without limitation, the filing or lack thereof of the any UCC-1 Financing Statement. Each Lender agrees that (i) it will not challenge or question or support any other Person in challenging or questioning in any proceeding the validity or enforceability of obligations owing to either Lenders or the Existing Loan Agreement or New Loan Agreement or the validity, attachment, perfection or priority of any Security Interest under any either of the Loan Agreements or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement.

b. **Security Interests In Inventory.**

i. Each Lender shall have a senior and prior Security Interest in motor vehicle units of Inventory that heretofore have been or are hereafter Specifically Financed by each such Lender for Borrower and the Proceeds thereof; provided, however, that any unit of Inventory that was Specifically Financed and for which all amounts owing on such unit of Inventory have been indefeasibly repaid in full to Lender (including, without limitation, all fees, interest and other expenses owed to Lender with respect to such Inventory), shall no longer be considered Specifically Financed as to the repaid Lender.

ii. Each Lender may perfect or cause to be perfected its Security Interest in or lien on motor vehicle units of Inventory whether by Uniform Commercial Code filing, possession, or otherwise, and Borrower shall take such action as may be necessary to permit and enable each Lender to achieve such perfection.

c. Borrower agrees that Borrower shall neither accept nor seek any financing from any Person other than each Lender in connection with any of Borrower's Inventory including financing that may qualify as Specifically Financed financing in any Inventory; nor will Borrower accept or seek any financing from both Lenders as to any single item of Inventory. Violation of these promises by Borrower shall constitute a breach of this Agreement and the Existing Loan Agreement and the New Loan Agreement between Borrower and each Lender.

i. In the event of any liquidation, sale, or other disposition of any Inventory that was Specifically Financed by either Lender, the Proceeds shall be subject to the priorities contained in this Agreement and paid to the Lender who holds the rights to the Specifically Financed Inventory and all Proceeds thereof.

3. ENFORCEMENT.

a. At any time after the occurrence of an event of default under the New Loan Agreement, New Lender shall have the exclusive right to take enforcement actions with respect to the New Lender Priority Collateral, and Existing Lender shall not take any enforcement action with respect to such Collateral without the prior written consent of New Lender.

b. At any time after the occurrence of an event of default under the Existing Loan Agreement, Existing Lender shall have the exclusive right to take enforcement actions with respect to the Existing Lender Priority Collateral, and New Lender shall not take any enforcement action with respect to such Collateral without the prior written consent of Existing Lender.

c. Borrower acknowledges that notwithstanding anything to the contrary in either the Existing Loan Agreement or the New Loan Agreement, any event of default committed in either of these agreements shall constitute an event of default under the other Lender's loan agreement.

d. Each Lender agrees to reasonably cooperate with the other Lender in connection with any enforcement action undertaken by such other Lender with respect to Collateral in which such other Lender has a senior Security Interest, including executing such documents and taking such actions as may be reasonably requested by such other Lender to effectuate such enforcement action, however, such cooperation shall neither include being required to or having to expend any out-of-pocket costs or incur and attorney's fees by having to engage counsel in order to effect such cooperation.

e. Any Proceeds received by either Lender from the disposition of Collateral in which the other Lender has priority as provided in this Agreement shall be held in trust by the Lender who has

received such Proceeds, shall remain segregated from such Lender's assets and shall be promptly paid over to such other Lender.

4. REPRESENTATIONS AND COVENANTS.

a. Existing Lender represents that it is the holder of the Security Interest granted by Borrower pursuant to the Existing Loan Agreement and has not assigned or otherwise transferred such Security Interest.

b. New Lender represents that it is the holder of the Security Interest granted by Borrower pursuant to the New Loan Agreement and has not assigned or otherwise transferred such Security Interest.

c. Each Lender agrees to provide the other Lender with written notice upon the occurrence of an event of default under its respective loan documents within five (5) business days after such Lender becomes aware of such default. Notwithstanding the preceding sentence, a failure by either Lender to provide such timely notice shall neither serve to effect either a default under this Agreement, permit any cause of action for damages or breach of contract nor adversely affect the priorities established by this Agreement.

d. Existing Lender shall not increase the maximum principal amount of the Existing Loan as expressed in the Recitals without the prior written consent of New Lender.

e. New Lender shall not increase the maximum principal amount of the New Loan as expressed in the Recitals without the prior written consent of Existing Lender.

f. Existing Lender agrees to file a new UCC-1 Financing Statement the timing of which will be after any filing by New Lender resulting in Existing Lender having one Financing Statement filed prior to and another Financing Statement filed after the Financing Statement filed by New Lender. After a period of four (4) months from the date of the filing of the latter Financing Statement Existing Lender will file a UCC-3 Financing Statement terminating the effectiveness of its prior filed Financing Statement. This provision is conditioned upon no other party having filed a Financing Statement the result of which Existing Lender's latest filing will not result in Existing Lender holding a duly perfected Security Interest in the next immediate priority to that of New Lender based on perfection governed by the filing of a Financing Statement.

g. Borrower agrees that the total available maximum principal amount of the Existing Loan, which is in the approximate amount of the Current Outstanding Balance shall be reduced to $3,000,000 (the "Revised Principal Outstanding Balance") within thirty (30) days from the Effective Date.

h. Borrower and Existing Lender agree that the total availability under the Existing Loan (the "Availability) shall be capped at the Revised Principal Outstanding Balance Amount as of the Effective Date. Upon reduction of the Current Outstanding Balance after the Effective Date, the Availability shall continue to be capped at the then Current Principal Outstanding Balance Amount until the Outstanding Balance is reduced to Revised Principal Outstanding Balance Amount, at which point the total availability under the Existing Loan shall be permanently reduced to Revised Principal Outstanding Balance Amount (i.e., $3,000,000) until the New Loan is satisfied in full.

5. TERMINATION.

a. This Agreement shall remain in force and effect indefinitely until the full and indefeasible payment all monetary and non-monetary obligations owing to a Lender are satisfied and an authorized representative of a Lender has filed UCC financing statement terminating the effectiveness of all UCC filings made by a Lender on Borrower. Notwithstanding the foregoing: if, after repayment of all monetary and non-monetary obligations owing to a Lender and termination of all UCC financing statements made by a Lender on Borrower, Borrower thereafter becomes liable to a Lender on account of any payment made to a Lender shall for any reason be required to be returned or refunded by a Lender, this Agreement shall thereupon in all respects become effective with respect to such subsequent or reinstated obligations, without the necessity of any further act or agreement between Lenders.

6. BANKRUPTCY OF BORROWER:

a. This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other applicable Bankruptcy Law by or against the Borrower or any Grantor. If Borrower shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, either Lender may raise any objection to any such financing or to the Security Interests on the Collateral securing the same ("***DIP Financing Liens***") or to any use of cash collateral that constitutes Collateral.

b. No Person is a third-party beneficiary of this Agreement and no trustee in bankruptcy for, or bankruptcy estate of, or unsecured creditor of, any Borrower will have or acquire or be entitled to exercise any right of a Lender under this Agreement, whether upon an avoidance or equitable subordination of a Security Interest held by a Lender, or otherwise.

7. MISCELLANEOUS PROVISIONS.

a. All notices hereunder, unless otherwise provided above, shall be in writing and shall be deemed to be properly given if sent by certified U.S. mail or recognized overnight delivery service, addressed to the party for whom it is intended at its address hereinafter set forth, or by telephonic facsimile communication or electronic mail promptly confirmed in writing. Any party hereto may designate a change of address by written notice to the others, given at least ten (10) days before such change of address is to become effective.

If to New Lender:

Ocean Bank
780 NW 42nd Ave.
Miami, FL, 33126
Attn: Javier Perez
Email: javperez@oceanbank.com

If to Existing Lender:

Quick Shift Capital, LLC
2200 Butts Rd
Suite 240
Boca Raton, FL 33431

Attn: Zach Green
Email: zach@quickshiftcapital.com

If to Borrower:
Benji Auto Sales Corp.
3805 S St Rd 7
West Park, FL 33023
Attn: Benjamin Urra Jr.
Email: Benjamin jr@benjiautosales.com

b. Borrower acknowledges and agrees to the terms and provisions of this Agreement

c. This Agreement is made and entered into under the laws of the state of Florida, and the laws of that state (without giving effect to the principles of conflicts of laws thereof) shall govern the validity, interpretation and enforcement hereof and the performance by the Lenders of their respective duties and obligations hereunder.

d. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties hereto.

e. Terms used in this Agreement that are defined in Section 1 shall have the meaning set forth in said section and no other. Said definitions shall, where applicable, also apply in the plural and past tense of said terms. All capitalized terms used in this Agreement shall have the meanings ascribed to such terms in the Uniform Commercial Code ("UCC") as adopted by the State of Florida:

f. The provisions of this Agreement shall inure to and be binding upon the parties hereto and their respective successors and assigns. The Lenders do not intend that this Agreement will benefit or create any right or cause of action in or on behalf of Borrower or any other third party. In the event either Lender were to seek to assign in whole or in part, or in the event that either Lender merges with any other Person and such Lender is not the surviving entity after completion of the merger, such Lender shall be obligated to get the express written acknowledgement of the assignee or surviving merger entity that such entity will agree to be bound by the provisions of this Agreement.

g. This Agreement may be executed in counterparts, each of which shall be deemed an original, but which together shall constitute one and the same Agreement. A genuinely signed document that contains a facsimile or electronic signature shall be valid and enforceable to the same extent as a document with an original signature. Each party agrees to execute and deliver such additional documents and instruments as may be necessary or appropriate to fully effectuate the terms and provisions of this Agreement so long as the provision of such additional documents and instruments is without costs or expenses to the non-requesting Lender.

h. If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall attach only to such provision and shall not affect or render invalid or unenforceable any other provision of this Agreement.

i. No failure or delay by either Lender in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

j. The relationship between the Lenders is, and at all times shall remain solely that of intercreditor of Borrower. Lenders shall not under any circumstances be construed to be partners or joint venturers of one another; nor shall the Lenders under any circumstances be deemed to be in a fiduciary relationship with one another or to owe any fiduciary duty to one another outside the duties expressly provided in this Agreement. Lenders do not undertake or assume any responsibility or duty to one another to select, review, inspect, supervise, pass judgment upon or otherwise inform each other of any matter in connection with Borrower's property, any Collateral held by either Lender or the operations of Borrower. Each Lender shall rely entirely on its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed either Lender in connection with such matters is solely for the protection of such Lender.

k. Should a dispute arise between the Lenders, they shall confer expeditiously to attempt to resolve the dispute. If they are unable to resolve the dispute, and the dispute relates to an isolated issue or issues and not to the whole of the arrangement, and the dispute can be severed from the ongoing process, the Lenders shall, within 10 days of impasse, select a mediator to assist the process of resolution. Mediation shall be conducted as expeditiously as the circumstances require but no later than 30 days after the impasse. If the Lenders are unable to resolve the dispute at mediation, either Lender may initiate an action to resolve the dispute. Pre-suit mediation shall not be required if the dispute relates to the whole of the relationship and cannot be severed from the ongoing relationship.

l. This Agreement is intended to define the rights and duties of the Lenders and it is not intended that any third party shall benefit from this Agreement. If the effect of any provision of this Agreement would be to give any third party a priority status to which that party would not otherwise be entitled, that provision shall, to the extent necessary to avoid that priority, be given no effect and the rights and priorities of the Lender shall be determined in accordance with applicable law.

m. The Borrower agrees to defend, indemnify and hold harmless each Lender and their respective directors, officers, employees, attorneys, successors and assigns from and against any and all claims, losses, liabilities, costs, damages and expenses, including, without limitation, reasonable legal and accounting fees, arising out of or in any way related to this Agreement or any action or omission of the Lender in complying with the terms of this Agreement.

n. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION OR DISPUTE BASED HEREON OR ARISING OUT OF OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR WITH ANY COURSE OF CONDUCT, COURSE OF DEALING, ORAL OR WRITTEN STATEMENT OR ACTIONS OF EITHER OF THE PARTIES. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH PARTY TO ENTER INTO THIS AGREEMENT.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**OCEAN BANK**
a Florida banking corporation

By: [signature]
Name: Savior Garcia
Title: VP & Branch Manager

**QUICK SHIFT CAPITAL LLC**
a Florida limited liability company

By:____________________
Name:____________________
Title:____________________

**BENJI AUTO SALES CORP.,**
a Florida corporation

**By:** [signature]
**Name:** Benji Urra
**Title:** Pres

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**OCEAN BANK**
a Florida banking corporation

By: ______________________________
Name: ______________________________
Title: ______________________________

**QUICK SHIFT CAPITAL LLC**
a Florida limited liability company

By: ______________________________
Name: ______________________________
Title: President

**BENJI AUTO SALES CORP.,**
a Florida corporation

**By:** ______________________________
**Name:** ______________________________
**Title:** ______________________________



#519921329_v4